[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14543

_____

D.C. Docket No. 1:13-cv-24506-WPD

CITY OF MIAMI,
a Florida Municipal Corporation,

Plaintiff - Appellant,

versus

BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., et al.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 1, 2015)

Before MARCUS and WILSON, Circuit Judges, and SCHLESINGER,[*] District
Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

The City of Miami has brought an ambitious fair housing lawsuit against Bank of America,[1] alleging that it engaged in a decade-long pattern of discriminatory lending in the residential housing market that caused the City economic harm. The City claims that the bank targeted black and Latino customers in Miami for predatory loans that carried more risk, steeper fees, and higher costs than those offered to identically situated white customers, and created internal incentive structures that encouraged employees to provide these types of loans. The predatory loans, as identified by the City, include: high-cost loans (i.e., those with an interest rate at least three percentage points above a federally established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and adjustable rate mortgages with teaser rates (i.e., a lifetime maximum rate greater than the initial rate plus 6%). Complaint for Violations of the Federal Fair Housing Act at 34, City of Miami v. Bank of America Corp., No. 13-24506-CIV (S.D. Fla. July 9, 2014) ("Complaint"). The City alleged that by steering minorities toward these predatory loans, Bank of America caused minority-owned properties throughout Miami to fall into

---

[1] The City also filed substantially similar complaints against Citigroup and Wells Fargo for the same behavior. The three cases were heard by the same judge in the Southern District of Florida, and resolved in the same way: the reasoning laid out in the district court's order in this case was adopted and incorporated in the orders dismissing the other two cases. They were each appealed separately. We have resolved the companion cases in separate opinions. See City of Miami v. Citigroup Inc., No. 14-14706; City of Miami v. Wells Fargo & Co., No. 14-14544. This opinion contains the most detailed account of our reasoning.

2

unnecessary or premature foreclosure, depriving the City of tax revenue and forcing it to spend more on municipal services (such as police, firefighters, trash and debris removal, etc.) to combat the resulting blight.   The City asserts one claim arising under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., as well as an attendant unjust enrichment claim under Florida law.

The district court dismissed the City's FHA claim with prejudice on three grounds: the City lacked statutory standing under the FHA because it fell outside the statute's "zone of interests"; the City had not adequately pled that Bank of America's conduct proximately caused the harm sustained by the City; and, finally, the City had run afoul of the statute of limitations and could not employ the continuing violation doctrine.  We disagree with each of these conclusions.

As a preliminary matter, we find that the City has constitutional standing to pursue its FHA claims.  We also conclude that under controlling Supreme Court precedent, the "zone of interests" for the Fair Housing Act extends as broadly as permitted under Article III of the Constitution, and therefore encompasses the City's claim.  While we agree with the district court that the FHA contains a proximate cause requirement, we find that this analysis is based on principles drawn from the law of tort, and that the City has adequately alleged proximate cause.  Finally, we conclude that the "continuing violation doctrine" can apply to the City's claims, if they are adequately pled.

3

Because the district court imposed too stringent a zone of interests test and wrongly applied the proximate cause analysis, we conclude that it erred in dismissing the City's federal claims with prejudice and in denying the City's motion for leave to amend on the grounds of futility.  As for the state law claim, we affirm the dismissal because the benefits the City allegedly conferred on the defendants were not sufficiently direct to plead an unjust enrichment claim under Florida law.

I.

On December 13, 2013, the City of Miami brought this complex civil rights action in the United States District Court for the Southern District of Florida against Bank of America Corporation, Bank of America N.A., Countrywide Financial Corporation, Countrywide Home Loans, and Countrywide Bank, FSB (collectively "Bank of America" or "the Bank") containing two claims.  First, it alleged that the defendants violated sections 3604(b)[2] and 3605(a)[3] of the Fair Housing Act, Complaint at 53, by engaging in discriminatory mortgage lending

---

[2] 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

[3] "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).  A "residential real estate-related transaction" includes "the making or purchasing of loans . . . for improving, constructing, repairing, or maintaining a dwelling; or secured by residential real estate."  Id. § 3605(b)(1).

practices that resulted in a disproportionate and excessive number of defaults by minority homebuyers and caused financial harm to the City. It also alleged that the Bank unjustly enriched itself by taking advantage of "benefits conferred by the City" while, at the same time, engaging in unlawful lending practices, which "denied the City revenues it had properly expected through property and other tax payments and . . . cost[] the City additional monies for services it would not have had to provide . . . absent [the Bank's] unlawful activities."

The complaint accused Bank of America of engaging in both "redlining" and "reverse redlining." Redlining is the practice of refusing to extend mortgage credit to minority borrowers on equal terms as to non-minority borrowers. Reverse redlining is the practice of extending mortgage credit on exploitative terms to minority borrowers. Complaint at 3. The City alleged that the Bank engaged in a vicious cycle: first it "refused to extend credit to minority borrowers when compared to white borrowers," then "when the bank did extend credit, it did so on predatory terms." Id. at 4. When minority borrowers then attempted to refinance their predatory loans, they "discover[ed] that [the Bank] refused to extend credit at all, or on terms equal to those offered . . . to white borrowers." Id. at 5.

The City claimed that this pattern of providing more onerous loans -- i.e., those containing more risk, carrying steeper fees, and having higher costs -- to black and Latino borrowers (as compared to white borrowers of identical

5

creditworthiness) manifested itself in the Bank's retail lending pricing, its wholesale lending broker fees, and its wholesale lending product placement.  Id. at 18-25.  It also averred that the Bank's internal loan officer compensation system encouraged its employees to give out these types of loans even when they were not justified by the borrower's creditworthiness.  See id. at 20, 24.  The City claimed that Bank of America's practice of redlining and reverse redlining constituted a "continuing and unbroken pattern" that persists to this day.  Id. at 4.

The City said that the Bank's conduct violated the Fair Housing Act in two ways.  First, the City alleged that the Bank intentionally discriminated against minority borrowers by targeting them for loans with burdensome terms.  Id. at 30-33.  Second, the City claimed that the Bank's conduct had a disparate impact on minority borrowers, resulting in a disproportionate number of foreclosures on minority-owned properties, and a disproportionate number of exploitative loans in minority neighborhoods.  Id. at 26-30.

Among other things, the City employed statistical analyses to draw the alleged link between the race of the borrowers, the terms of the loans, and the subsequent foreclosure rate of the underlying properties.  Drawing on data reported by the Bank about loans originating in Miami from 2004-2012, the City claimed that a Bank of America loan in a predominantly (greater than 90%) minority neighborhood of Miami was 5.857 times more likely to result in foreclosure than

6

such a loan in a majority-white neighborhood.  Id. at 43.  According to the City's regression analysis (which purported to control for objective risk characteristics such as credit history, loan-to-value ratio, and loan-to-income ratio), id. at 37, a black Bank of America borrower in Miami was 1.581 times more likely to receive a loan with "predatory" features[4] than a white borrower, and a Latino borrower was 2.087 times more likely to receive such a loan.  Moreover, black Bank of America borrowers with FICO scores over 660 (indicating good credit) in Miami were 1.533 times more likely to receive a predatory loan than white borrowers, while a Latino borrower was 2.137 times more likely to receive such a loan.  Id. at 6.

The City's data also suggested that from 2004-2012, 21.9% of loans made by Bank of America to black and Latino customers in Miami were high-cost, compared to just 8.9% of loans made to white customers.  Id. at 34.  Data cited in the complaint showed significantly elevated rates of foreclosure for loans in minority neighborhoods.  While 53.3% of Bank of America's Miami loan originations were in "census tracts" that are at least 75% black or Latino, 95.7% of loan originations that had entered foreclosure by June 2013 were from such census

---

[4] As we've noted, the City identified as "predatory" those containing features such as high-cost loans (i.e., those with an interest rate that was at least three percentage points above a federally established benchmark), subprime loans, interest-only loans, balloon loan payments, loans with prepayment penalties, negative amortization loans, no documentation loans, and adjustable rate mortgages with teaser rates (i.e., a lifetime maximum rate greater than the initial rate plus 6%). Complaint at 34.

tracks.  Id. at 39.  And 32.8% of Bank of America's loans in predominantly black or Latino neighborhoods resulted in foreclosure, compared to only 7.7% of its loans in non-minority (at least 50% white) neighborhoods.  Id. at 40.  Likewise, a Bank of America borrower in a predominantly black or Latino census tract was 1.585 times more likely to receive a predatory loan as a borrower with similar characteristics in a non-minority neighborhood.  Id. at 38.

The complaint also alleged that the bank's loans to minorities resulted in especially quick foreclosures.[5]  The average time to foreclosure for Bank of America's black and Latino borrowers was 3.144 years and 3.090 years, respectively, while for white borrowers it was 3.448 years.  Id. at 42.  The allegations also gathered data from various non-Miami-based studies (some nationwide, some based on case studies in other cities) to demonstrate the elevated prevalence of foreclosure, predatory loan practices, and higher interest rates among black and Latino borrowers, and the foreseeability of foreclosures arising from predatory lending practices and their attendant harm.  See id. at 26-30.

The City's charges were further amplified by the statements of several confidential witnesses who claimed that the Bank deliberately targeted black and

---

[5] The complaint quoted a joint report from the Department of Housing and Urban Development and the Department of the Treasury noting that time to foreclosure is an important indicator of predatory practices: "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."  U.S. Dep't of Hous. & Urban Dev. & U.S. Dep't of Treasury, Curbing Predatory Home Mortgage Lending 25 (2000), available at http://www.huduser.org/Publications/pdf/treasrpt.pdf.  Complaint at 43.

Latino borrowers for predatory loans.  Thus, for example, one mortgage loan officer with Bank of America who worked on loans in the Miami area claimed that the bank targeted less savvy minorities for negative amortization loans.  Id. at 31.  Another noted that Bank of America paid higher commissions to loan officers for Fair Housing Act loans as opposed to the allegedly more advantageous Community Reinvestment Act (CRA) loans, incentivizing officers to steer borrowers away from the CRA loans.  Id. at 32.  Still another noted that back-end premiums (a premium earned by the loan officer equal to the difference between the borrower's loan rate and the rate the bank pays for it) on loans were not disclosed and "often eluded less educated, minority borrowers."  Id.  One of the witnesses explained that from 2011-2013, Bank of America did not offer regular refinancing to persons with mortgages at over 80% of the value of the house (including many negative amortization loans), which disproportionately affected minorities in danger of losing their homes.  Id. at 33.

Notably, the City sought damages based on reduced property tax revenues.  Id. at 45.  It claimed that the Bank's lending policies caused minority-owned property to fall into unnecessary or premature foreclosure.  Id.  The foreclosed-upon properties lost substantial value and, in turn, decreased the value of the surrounding properties, thereby depriving the City of property tax revenue.  The City alleged that "Hedonic regression" techniques could be used to quantify the

9

losses the City suffered that were attributable to the Bank's conduct. Id. at 46-47. The City also sought damages based on the cost of the increased municipal services it provided to deal with the problems attending the foreclosed and often vacant properties -- including police, firefighters, building inspectors, debris collectors, and others. These increased services, the City claimed, would not have been necessary if the properties had not been foreclosed upon due to the Bank's discriminatory lending practices. Id. at 49-50. The City also sought a declaratory judgment that the Bank's conduct violated the FHA, an injunction barring the Bank from engaging in similar conduct, and punitive damages, as well as attorneys' fees. Id. at 55-56.

On July 9, 2014, the district court granted defendants' motion to dismiss.[6] First, the court found that the City of Miami lacked statutory standing to sue under the FHA. The court determined that, based on this Court's earlier opinion in Nasser v. City of Homewood, 671 F.2d 432 (11th Cir. 1982), the City's claim fell outside the FHA's "zone of interests," and therefore the City lacked standing to sue under this statute. In particular, the trial court determined that the City had alleged "merely economic injuries" that were not "affected by a racial interest." Like the plaintiffs in Nasser, the court suggested, the City was seeking redress under the

---

[6] This order was adopted and incorporated in the two companion cases involving Citigroup and Wells Fargo.

FHA for "an economic loss from a decrease in property values," and as with the plaintiffs in <u>Nasser</u>, this was insufficient.  The City's goal went far beyond the purpose of the FHA, which is to "provide, within constitutional limitations, for fair housing throughout the United States."  <u>City of Miami v. Bank of America Corp.</u>, 2014 WL 3362348, at *4 (quoting 42 U.S.C. § 3601).

The court also concluded that the FHA contains a proximate cause requirement, but that the City had not adequately pled proximate cause.  The City had not sufficiently traced any foreclosures to the defendants' conduct, as opposed to confounding background variables such as "a historic drop in home prices and a global recession," and "the decisions and actions of third parties, such as loan services, government entities, competing sellers, and uninterested buyers."  <u>Id.</u> at *5.  The court also determined that the City had not shown that the Bank's mortgage practices caused the City any harm.  It was unimpressed with the "statistics and studies" the City cited, noting that some were not based on data from Miami, some were not limited to the defendants' practices, and others "d[id] not control for relevant credit factors that undoubtedly affect lending practices."  <u>Id.</u>  Moreover, some of the harm to the City stemmed directly from "the actions of intervening actors such as squatters, vandals or criminals that damaged foreclosed properties."  <u>Id.</u>

The district court also concluded that the City's federal claim ran afoul of the statute of limitations. It noted that for the FHA, a plaintiff must bring his claim "not later than 2 years after the occurrence" of the discriminatory housing practice, and that for discriminatory loans the statute of limitations begins to run from the date of the loan closing. But the City had not alleged that any loans were made later than 2008, a full five years before its complaint was filed. The court was not persuaded by the City's invocation of the continuing violation doctrine -- which can allow plaintiffs, under some circumstances, to sue on an otherwise time-barred claim -- since the City had not alleged sufficient facts to support its allegation that the specific practices continued into the statutory period. The district court dismissed the City's FHA claim with prejudice, reasoning that even if the statute of limitations deficiencies could be cured by an amended pleading, the City's lack of statutory standing could not be.

Finally, the district court rejected the City's unjust enrichment claim on several grounds. As a preliminary matter, the City had failed to draw the necessary causal connection between the Bank's alleged discriminatory practices and its receipt of undeserved municipal services. Moreover, the court found that the City had failed to allege basic elements of an unjust enrichment claim under Florida law. It determined that any benefit the Bank received from municipal services was not direct but "derivative" and, therefore, insufficient to support an unjust

12

enrichment claim.  It also found that the City had failed to allege that the Bank was not otherwise entitled to those services as a Miami property owner.  Finally, it rejected the City's argument that Miami was forced to pay for the Bank's externalities (the costs of the harm caused by its mortgage lending), holding that paying for externalities cannot sustain an unjust enrichment claim.  The district court dismissed the unjust enrichment claim without prejudice, leaving the City free to amend its complaint.

The City chose not to proceed on its unjust enrichment claim alone "because the two claims are so intimately entwined and based on largely the same underlying misconduct."  Instead, it moved in the district court for reconsideration and for leave to file an amended complaint, arguing that it had standing under the FHA and that the amended complaint would cure any statute of limitations deficiency.  The proposed amended complaint alleged that the Bank's discriminatory lending practices "frustrate[] the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community," thereby "directly interfer[ing]" with one of the City's missions.  First Amended Complaint for Violations of the Federal Fair Housing Act at 31, City of Miami v. Bank of America Corp., No. 13-24506-CIV (S.D. Fla. Sept. 9, 2014) ("Amended Complaint").  It also made more detailed allegations about properties that had been foreclosed upon after being subject to discriminatory loans.

13

Specifically, the proposed amended complaint identified five foreclosed properties that corresponded to predatory loans that originated between 2008 and 2012, and three that originated between 2004 and 2008. It also identified seven properties that corresponded to predatory loans that the Bank had issued after December 13, 2011 (within two years of filing suit) that had not yet been foreclosed upon but were likely to "eventually enter the foreclosure process," based on expert analysis. Id. at 36-37. The complaint continued to invoke the continuing violation doctrine and claimed that the statute of limitations had not run.

The district court denied the City's motion for reconsideration and for leave to amend. As for statutory standing, the court explained that "[a]rguing that this Court's reasoning was flawed is not enough for a motion for reconsideration." City of Miami v. Bank of America Corp., 2014 WL 4441368, at *2. And the court was unimpressed by the City's new argument that it "has a generalized non-economic interest . . . in racial diversity," ruling that these were "claims [the City] never made and amendments it did not previously raise or offer despite ample opportunity," and were therefore "improperly raised as grounds for reconsideration." Id. Finally, the court noted that these "generalized allegations [do not] appear to be connected in any meaningful way to the purported loss of tax revenue and increase in municipal expenses allegedly caused by Defendants' lending practices." Id. at *2 n.1.

14

The City timely appealed the court's final order of dismissal.

## II.

### A. Standard of Review

We review the district court's grant of a motion to dismiss with prejudice <u>de novo</u>, "accepting the [factual] allegations in the complaint as true and construing them in the light most favorable to the plaintiff." <u>Mills v. Foremost Ins. Co.</u>, 511 F.3d 1300, 1303 (11th Cir. 2008) (quotation omitted). We generally review the district court's decision to deny leave to amend for an abuse of discretion, but we will review <u>de novo</u> an order denying leave to amend on the grounds of futility, because it is a conclusion of law that an amended complaint would necessarily fail. <u>Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.</u>, 641 F.3d 1259, 1264 (11th Cir. 2011). Finally, we review <u>de novo</u> whether plaintiffs have Article III standing. <u>Ga. Latino Alliance for Human Rights v. Governor of Ga.</u>, 691 F.3d 1250, 1257 (11th Cir. 2012).

### B. Fair Housing Act Claim

### 1. Article III Standing

We come then to the first essential question in the case: whether the City of Miami has constitutional standing to bring its Fair Housing Act claim. <u>See</u> <u>Bochese v. Town of Ponce Inlet</u>, 405 F.3d 964, 974 (11th Cir. 2005) ("[Article III] [s]tanding is a threshold jurisdictional question which must be addressed prior

15

to . . . the merits of a party's claims." (quoting Dillard v. Baldwin Cnty. Comm'rs, 225 F.3d 1271, 1275 (11th Cir. 2000)).  Although the district court addressed only the issue of so-called "statutory standing," the Bank contests both Article III standing and statutory standing, and we address each in turn.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). It is by now axiomatic that to establish constitutional standing at the pleading stage, the plaintiff must plausibly allege: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) "a causal connection between the injury and the conduct complained of," such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that a favorable judicial decision will "likely" redress the injury.  See Bochese, 405 F.3d at 980 (quotation omitted).  The "line of causation" between the alleged conduct and the injury must not be "too attenuated."  Allen v. Wright, 468 U.S. 737, 752 (1984).  The party invoking federal jurisdiction bears the burden of establishing these elements.  See FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990).  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to demonstrate standing.  Defs. of Wildlife, 504 U.S. at 561.

The district court did not address whether the City had Article III standing because it granted the Bank's motion to dismiss on other grounds.  On appeal, the

16

Bank argues that the City lacked Article III standing because it had not adequately alleged the causal connection -- that is, the "traceability" -- between its injury and the Bank's conduct. We are unpersuaded.

To recap, the City claims that the Bank's discriminatory lending practices caused minority-owned properties to fall into foreclosure when they otherwise would not have, or earlier than they otherwise would have. This, in turn, decreased the value of the foreclosed properties themselves and the neighboring properties, thereby depriving the City of property tax revenue, and created blight, thereby forcing the City to spend additional money on municipal services. Complaint at 45-50. We have little difficulty in finding, based on controlling Supreme Court caselaw, that the City has said enough to allege an injury in fact for constitutional standing purposes. Our analysis is guided by Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91 (1979). In that case, the Village of Bellwood sued a real estate firm under the FHA for discriminatory renting practices that caused racial segregation. Id. at 94-95. The Supreme Court held that the village had Article III standing to bring its claim partly on the basis of "[a] significant reduction in property values," because such a reduction "directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." Id. at 110-11. Like the Village of Bellwood, the City of Miami claims that an allegedly discriminatory policy has reduced local

17

property values and diminished its tax base.  Thus, like the Village of Bellwood, the City of Miami has adequately alleged an injury in fact.

As for Article III causation, the Bank claims that the City's harm is not fairly traceable to the Bank's conduct.  Specifically, it suggests that a myriad of other factors cause foreclosure and blight -- including the state of the housing market and the actions of third parties like other property owners, competing sellers, vandals, etc. -- thereby breaking the causal chain.  While we acknowledge the real possibility of confounding variables, at this stage in the proceeding the City's alleged chain of causation is perfectly plausible: taking the City's allegations as true, the Bank's extensive pattern of discriminatory lending led to substantially more defaults on its predatory loans, leading to a higher rate of foreclosure on minority-owned property and thereby reducing the City's tax base.  See Cnty. of Cook v. Wells Fargo & Co., No. 14 C 9548, 2015 WL 4397842, at *3-4 (N.D. Ill. July 17, 2015) (finding the same causal allegation sufficient for Article III traceability in a materially identical FHA case and citing eight other district court cases finding the same).  Moreover, the complaint supports its allegations with regression analyses that link the Bank's treatment of minority borrowers to predatory loans, predatory loans to foreclosure, and foreclosure to reduced tax revenue.  Complaint at 6, 37-38, 44, 46.  All told, the City has "allege[d] . . . facts

essential to show jurisdiction." FW/PBS, 493 U.S. at 231 (quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).

Of course, the City has limited its claim only to those damages arising from foreclosures caused by the Bank's lending practices. At a subsequent stage in the litigation it may well be difficult to prove which foreclosures resulted from discriminatory lending, how much tax revenue was actually lost as a result of the Bank's behavior, etc. But at this early stage, the claim is plausible and sufficient. The City has said enough to establish Article III standing.[7]

## 2. "Statutory Standing"

The district court dismissed the City's claim, however, not on the basis of Article III standing, but because it lacked what the court characterized as "statutory standing." It found that the City fell outside the FHA's "zone of interests," and that its harm was not proximately caused by the Bank's actions. Ultimately, we disagree with the district court's legal conclusions. As for the zone of interests, we conclude that we are bound by Supreme Court precedent stating that so-called statutory standing under the FHA extends as broadly as Article III will permit, and find that this includes the City. As for proximate cause, we agree that it must be

---

[7] The third Lujan factor, redressability, is not at issue in this appeal. The City has "allege[d] a monetary injury and an award of compensatory damages would redress that injury." Resnick v. AvMed, Inc., 693 F.3d 1317, 1324 (11th Cir. 2012).

pled for a damages claim under the FHA, but find that the City has adequately done so here.

Notably, the Supreme Court recently clarified in Lexmark International, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014), that the longstanding doctrinal label of "statutory standing" (sometimes also called "prudential standing") is misleading.  The proper inquiry is whether the plaintiff "has a cause of action under the statute."  Id. at 1387.  But that inquiry isn't a matter of standing, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case."  Id. at 1387 n.4 (quoting Verizon Md. Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 642-643 (2002)).  Instead, it is "a straightforward question of statutory interpretation."  Id. at 1388.

This issue comes before the Court on a motion to dismiss for failure to state a claim, and the City's pleadings are evaluated for plausibility using the standard set forth in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The complaint must contain enough facts to make a claim for relief plausible on its face; a party must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  Resnick v. AvMed, Inc., 693 F.3d 1317, 1324-25 (11th Cir. 2012) (quoting Iqbal, 556 U.S. at 678).  Of course, in evaluating the plausibility of

20

the claim we must take all of the plaintiff's factual allegations as true.  See Iqbal, 556 U.S. at 678.

### a. Zone of Interests

In general, a statutory cause of action "extends only to those plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" Lexmark, 134 S. Ct. at 1388 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). The Supreme Court has instructed us that this test "applies to all statutorily created causes of action," but its application is not uniform: "certain statutes . . . protect a more-than-usually 'expansive' range of interests." Id. (quoting Bennett v. Spear, 520 U.S. 154, 164 (1997)) (alteration adopted).

The FHA provides that

> [a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(a)(1)(A).  It defines an "aggrieved person" as anyone who "claims to have been injured by a discriminatory housing practice," or "believes that such person will be injured by a discriminatory housing practice that is about to occur." Id. at § 3602(i).

The Bank claims that the City is not an "aggrieved person," and, therefore, falls outside the statute's zone of interests and cannot state a cause of action under

21

the FHA.  The City argues, however, that "FHA statutory standing is as broad as the Constitution permits under Article III," and therefore it is within the statute's zone of interests.  Older Supreme Court cases appear to support the City's view, while certain more recent cases -- as well as an older decision of this Court -- have cast some doubt on the viability of those holdings.  The answer requires carefully parsing both Supreme Court and Eleventh Circuit precedent, and a review of the relevant cases is instructive.

### i. Early Supreme Court cases

The first major FHA case explicated by the Supreme Court is Trafficante v. Metropolitan Life Insurance, 409 U.S. 205 (1972).  Two tenants of an apartment complex -- one black, one white -- alleged that the landlord discriminated against minorities on the basis of race when renting units, in violation of the FHA.  Id. at 206-07.  The Court held that standing under the Act was defined "as broadly as is permitted by Article III of the Constitution . . . insofar as tenants of the same housing unit that is charged with discrimination are concerned."  Id. at 209 (quotation omitted).   "The language of the Act is broad and inclusive," the Court wrote, and "the alleged injury to existing tenants by exclusion of minority persons from the apartment complex is the loss of important benefits from interracial associations."  Id. at 209-10.

22

Seven years later, in Gladstone, the Village of Bellwood brought suit under the FHA against two real estate firms for "steering" black and white homeowners into targeted, race-specific neighborhoods, thereby "manipulat[ing] the housing market," "affecting the village's racial composition," and causing "[a] significant reduction in property values." 441 U.S. at 109-10. The Court concluded that the village had stated a cause of action under the FHA and reaffirmed, based on the legislative history and purpose of the statute, that statutory standing under the FHA "is as broad as is permitted by Article III of the Constitution." Id. at 109 (quotation omitted and alteration adopted).

Next came Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), in which -- along with other plaintiffs -- a nonprofit corporation whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area" brought an FHA claim against a realty firm for racial steering (i.e., fostering racial segregation by guiding prospective buyers towards or away from certain apartments based on the buyer's race). In the clearest and most unambiguous terms, the Supreme Court reiterated the holding of Gladstone: "Congress intended standing under [the FHA] to extend to the full limits of Art. III and . . . the courts accordingly lack the authority to create prudential barriers to standing in suits brought under [the FHA]." Id. at 372 (quotation omitted). As the Court explained, "the sole requirement for standing to sue under [the FHA] is the Art. III minima of

23

injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'" Id. (quoting Warth v. Seldin, 422 U.S. 490, 501 (1975)). The organization's allegation that the racial steering "perceptibly impaired [its] ability to provide counseling and referral services for low- and moderate-income homeseekers" was sufficient to constitute injury in fact for purposes of Article III (and statutory) standing. Id. at 379.

## ii. Nasser

Less than a month after Havens, the Eleventh Circuit issued an opinion in Nasser, 671 F.2d 432, on which the district court and the Bank principally rely. In Nasser, property owners challenged a zoning ordinance that rezoned their property from multi-family residential to single-family residential, alleging, inter alia, that the ordinance violated the FHA. Id. at 434. In 1976, the plaintiffs entered into an agreement with a developer for the construction of a multi-family housing complex on their property. The developer had looked into the possibility of making some units of this complex available for low- and moderate-income families via rent subsidies, and had inquired with the Department of Housing and Urban Development. But the development never materialized. A detailed affidavit from a member of the county planning commission stated that the plaintiffs had never suggested that their purpose "was to build a multi-family project for the use and benefit of low income or minority groups." Id. at 435. Instead, the affidavit

24

claimed that the plaintiffs had represented their project as "an exclusive-high rent apartment complex." Id. The Court found that there was no "evidence that the 1976 project was in any way affected by or related to racial or other minority interests." Id.

Three years later, the land was re-zoned. Id. at 434. The plaintiffs claimed that the re-zoning had reduced the value of their property by more than 50% (from $285,000 to $135,000). See id. at 435. A panel of this Court concluded that the plaintiffs lacked statutory standing under the FHA despite this purported economic injury. In making this determination, the Court considered Trafficante and Gladstone, and concluded: "There is no indication that the [Supreme] Court intended to extend standing, beyond the facts before it, to plaintiffs who show no more than an economic interest which is not somehow affected by a racial interest." Id. at 437. The Nasser Court found that the property owners lacked an economic interest affected by a racial interest, and therefore lacked standing to sue under the FHA. Id. at 438.

### iii. Newer Supreme Court cases on statutory standing

Two recent Supreme Court cases have cast some doubt on the broad interpretation of FHA statutory standing in Trafficante, Gladstone, and Havens. In Thompson v. North American Stainless, LP., 562 U.S. 170 (2011), the Court considered whether an employee had a cause of action under Title VII, which uses

25

nearly identical statutory language to the FHA.  See 42 U.S.C. § 2000e-5(f)(1) ("[A] civil action may be brought . . . by the person claiming to be aggrieved."). The Court rejected the argument that this language expanded statutory standing to the limits of Article III.  Id. at 177.  Instead, it drew an analogy to the Administrative Procedure Act (which contains similar language) and held that plaintiffs must "fall[] within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  Id. at 177-78 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990)).

The Court acknowledged that this analysis was in some tension with Trafficante and Gladstone.  But in glossing Trafficante, the Thompson Court focused on language in the opinion that arguably limited the holding to its facts: the Trafficante Court stated that standing under the FHA was coextensive with Article III only "insofar as tenants of the same housing unit that is charged with discrimination are concerned."  Id. at 176 (quoting Trafficante, 409 U.S. at 209). The Thompson Court acknowledged that later cases (such as Gladstone) reiterated that standing under the FHA "reaches as far as Article III permits" without any limiting language, but it stated that "the holdings of those cases are compatible with the 'zone of interests' limitation" that the Court went on to read into Title VII. Id. at 177.

26

Finally, the Supreme Court's recent opinion in Lexmark (interpreting the Lanham Act) discarded the labels "prudential standing" and "statutory standing," and clarified that the inquiry was really a question of statutory interpretation, and not standing at all. 134 S. Ct. at 1386-87 & n.4. One aspect of this interpretation, the Court explained, was a zone of interests analysis, which "requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Id. at 1387. The Court went on to say that this zone of interests test "applies to all statutorily created causes of action." Id. at 1388. Lexmark did not mention the FHA or any of the Court's FHA cases.

### iv. Analysis

The scope and role of the zone of interests analysis in the FHA context is a difficult issue, and one that has sharply divided the courts that have considered it. Compare, e.g., Cnty. of Cook, 2015 WL 4397842, at *5-6 (holding that Thompson and Lexmark effectively overruled the Supreme Court's interpretation of FHA statutory standing as being coextensive with Article III standing), with, e.g., City of Los Angeles v. JPMorgan Chase & Co., No. 2:14-CV-04168-ODW, 2014 WL 6453808, at *6 (C.D. Cal. Nov. 14, 2014) (finding that the Supreme Court's original interpretation of FHA statutory standing remained good law after Thompson and Lexmark). Ultimately, we disagree with the district court, and hold

27

that the phrase "aggrieved person" in the FHA extends as broadly as is constitutionally permissible under Article III.

Simply put, Trafficante, Gladstone, and Havens have never been overruled, and the law of those cases is clear as a bell: "[statutory] standing under [the FHA] extends 'as broadly as is permitted by Article III of the Constitution.'" Gladstone, 441 U.S. at 98 (quoting Trafficante, 409 U.S. at 209); accord Havens, 455 U.S. at 372. While Thompson has gestured in the direction of rejecting that interpretation, a gesture is not enough. The rule governing these situations is clear: "if a precedent of the Supreme Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court[] the prerogative of overruling its own decisions." Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1263 (11th Cir. 2012) (quotation omitted and alterations adopted); accord Tenet v. Doe, 544 U.S. 1, 10-11 (2005). In other words, "the Supreme Court has insisted on reserving to itself the task of burying its own decisions." Evans, 699 F.3d at 1263 (quotation omitted).

Notably, Thompson itself was a Title VII case, not a Fair Housing Act case. Thompson surveyed Trafficante and Gladstone, but did not explicitly overrule them -- nor could it, given the different statutory context in which it arose. Instead, the Court held that any suggestion drawn from the FHA cases that Title VII's

28

cause of action is similarly broad was "ill-considered" dictum.  Thompson, 562

U.S. at 176.  It's true that Title VII contains nearly identical statutory language to

the FHA, and therefore the Thompson Court's interpretation of Title VII may

signal that the Supreme Court is prepared to narrow its interpretation of the FHA in

the future.  (The dicta in Thompson indicating that its Title VII interpretation is

"compatible" with the Court's previous FHA holdings suggests as much.  See 562

U.S. at 176-77.)  But that day has not yet arrived, and until it does, our role as an

inferior court is to apply the law as it stands, not to read tea leaves.  The still-

undisturbed holding of the Supreme Court's FHA cases is that the definition of an

"aggrieved person" under the FHA extends as broadly as permitted under Article

III.

This Court's binding precedent in Nasser is not to the contrary.  Nasser

stands for the unremarkable proposition that a plaintiff has no cause of action

under the FHA if he makes no allegation of discrimination (or disparate impact) on

the basis of race (or one of the FHA's other protected characteristics: color,

religion, sex, handicap, familial status, and national origin).  The allegation of

discrimination provides the "racial interest" Nasser requires to bring an economic

injury within the scope of the statute.  671 F.2d at 437.  The Nasser plaintiffs'

claim was unrelated to race (or any protected FHA characteristic) altogether; they

simply objected to the rezoning of their property because it cost them money.  As

the Nasser Court put it, the plaintiffs' "interest in [the] value of the property in no way implicate[d] [the] values protected by the Act." Id.

Indeed, this is exactly how subsequent Eleventh Circuit caselaw has treated Nasser. In Baytree of Inverrary Realty Partners v. City of Lauderhill, 873 F.2d 1407 (11th Cir. 1989) -- the only case of this Court to revisit or reference Nasser's treatment of the FHA -- we held that a non-minority real estate developer, Baytree, stated a claim under the FHA when it challenged the city's decision to rezone its property, alleging that the decision was racially motivated and rendered the property worthless. Id. at 1408. We distinguished Nasser as a case "in which plaintiffs alleged only an economic injury unaffected by any racial interest," and found it inapposite because Baytree had properly alleged that its injury "result[ed] from racial animus." Id. at 1409. The same is true of the City of Miami's claim. Like Baytree, the City claims to have suffered an economic injury resulting from a racially discriminatory housing policy; in neither case does Nasser prevent the plaintiff from stating a claim under the FHA.

In sum, we agree with the City that the term "aggrieved person" in the FHA sweeps as broadly as allowed under Article III; thus, to the extent a zone of interests analysis applies to the FHA, it encompasses the City's allegations in this case. The City's claim does not suffer from the same flaw as the Nasser plaintiffs', because the City has specifically alleged that its injury is the result of a Bank

30

policy either expressly motivated by racial discrimination or resulting in a disparate impact on minorities.

### b. Proximate Cause

The district court also concluded that the City's pleadings did not sufficiently allege that the Bank's lending practices were a proximate cause of the City's injury. It determined that the City had not "allege[d] facts that isolate Defendants' practices as the cause of any alleged lending disparity" compared to the background factors of a cratering economy and the actions of independent actors such as "loan services, government entities, competing sellers, and uninterested buyers." City of Miami v. Bank of America Corp., 2014 WL 3362348, at *5. It also found that the City's statistical analyses indicating that foreclosures caused economic harm were "insufficient to support a causation claim," because some of the studies were not limited to Miami, some were not limited to the defendants' practices, and some did not control for relevant credit factors. Id. The plaintiffs disagree, arguing that they need not plead proximate causation at all, only the lesser "traceability" required by Article III. In the alternative, they say that their pleadings were sufficient under either standard. Although we agree with the Bank and the district court that proximate cause is a required element of a damages claim under the FHA, we find that the City has pled it adequately.

31

In <u>Lexmark</u>, the Supreme Court illuminated the doctrine of proximate cause as it relates to statutory causes of action. "[W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." 134 S. Ct. at 1390. This principle reflects "the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing," as well as the Court's assumption that Congress is familiar with the traditional common-law rule and "does not mean to displace it <u>sub silentio</u>." <u>Id.</u> (quotation omitted). The Court made clear that proximate causation is not a requirement of Article III, but rather an element of the cause of action under a statute, and it "must be adequately alleged at the pleading stage in order for the case to proceed." <u>Id.</u> at 1391 n.6. The Supreme Court has read a variety of federal statutory causes of action to contain a proximate cause requirement. <u>See, e.g.</u>, <u>Lexmark</u>, 134 S. Ct. at 1390-93 (Lanham Act); <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 346 (2005) (securities fraud); <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S. 258, 265-68 (1992) (RICO); <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 529-35 (1983) (Clayton Act).

Although proximate cause "is not easy to define," the basic inquiry is "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." <u>Lexmark</u>, 134 S. Ct. at 1390. The requirement is "more

32

restrictive than a requirement of factual cause alone," Paroline v. United States, 134 S. Ct. 1710, 1720 (2014), and we have said that it demands "something [more]" than Article III traceability, Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1273 (11th Cir. 2003); see also Lexmark, 134 S. Ct. at 1391 n.6. But the nature of the proximate cause requirement differs statute by statute: it is "controlled by the nature of the statutory cause of action," so the scope of liability depends on the statutory context. Lexmark, 134 S. Ct. at 1390.

No case of the Supreme Court or this Court has ever dealt directly with the existence or application of a proximate cause requirement in the FHA context. But certain statements by the Supreme Court suggest that proximate cause must exist for a damages action brought under the FHA. First, the Lexmark Court characterized proximate cause as a "general[] presum[ption]" in statutory interpretation. Id. at 1390. Moreover, the Supreme Court has observed that an FHA damages claim is "in effect, a tort action," governed by general tort rules, Meyer v. Holley, 537 U.S. 280, 285 (2003); Curtis v. Loether, 415 U.S. 189, 195 (1974) ("A damages action under the [FHA] sounds basically in tort -- the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach."), and proximate cause is a classic element of a tort claim, see Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 198 (2d ed. 2011). If the City's claim is functionally

33

a tort action, then presumably the City must adequately plead proximate cause, just like any other plaintiff raising any tort claim.  At least two of our sister circuits appear to have reached the same conclusion.  See Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1167-68 & n.32 (9th Cir. 2013) (noting that a damages action under the FHA "sounds basically in tort" and applying a proximate cause requirement), cert. denied sub nom. City of Newport Beach v. Pac. Shores Props., LLC, 135 S. Ct. 436 (2014); Samaritan Inns, Inc. v. Dist. of Columbia, 114 F.3d 1227, 1234-35 (D.C. Cir. 1997) (same); see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp., No. 3:10-CV-83, 2015 WL 853193, at *4-5 (S.D. Ohio Feb. 26, 2015) (holding that a fair housing organization must establish proximate cause because it is "one step removed from the discrimination," so its claimed damages must be "t[ied] . . . to the defendant's alleged wrongdoing").[8]

---

[8] We recognize that our conclusion that a private cause of action under the FHA contains a proximate cause requirement may be in some tension with the Supreme Court's general holding that statutory standing under the FHA extends as broadly as permitted under Article III.  As we've explained, Article III's only causation requirement is that the plaintiff's injury be "fairly traceable" to the defendant's unlawful conduct.  Defs. of Wildlife, 504 U.S. at 590 (quoting Allen, 468 U.S. at 751).  Plainly, proximate cause is not an element of constitutional standing.  See Lexmark, 134 S. Ct. at 1391 n.6.  Nonetheless, we do not interpret Trafficante, Gladstone, or Havens to have read a proximate cause requirement out of the statute.  Nothing in those cases decided, or even asked, whether some kind of proximate cause requirement is an element of an FHA claim.

To the extent those cases addressed Article III standing, they were concerned with what we call today the first Lujan factor: injury in fact -- an injury that is "concrete and particularized," and "actual or imminent."  Defs. of Wildlife, 504 U.S. at 560.  In Trafficante, the plaintiffs were two tenants, one black, one white, who had lost the benefit of interracial associations; causation was not discussed.  409 U.S. at 206; see Gladstone, 441 U.S. at 112-13 (characterizing Trafficante's holding as turning on Article III's injury-in-fact requirement).  In Gladstone, causation was again not considered, except for a suggestion in dicta that evidence of

The Bank argues that proximate cause creates a "directness requirement" within the FHA, and that the City's pleadings, therefore, fail because they do not allege that the Bank's actions directly harmed the City. The City does not accuse the Bank of discriminating against the City itself in its lending practices; instead, it claims that the Bank's discriminatory practices led the City to lose tax revenue and spend money combating the resulting blight. This harm, the Bank claims, is too indirect to have been proximately caused by the Bank's conduct.

We disagree. The Bank proposes to draw its proximate cause test from other statutory contexts, primarily from the Supreme Court's interpretation of the Racketeer Influenced and Corrupt Organizations Act (RICO) in Holmes, 503 U.S. 258. In that case, the Court read a proximate cause requirement into RICO, reasoning that its statutory language (granting a cause of action to anyone injured

---

the defendant's business practices might "be relevant to the establishment of the necessary causal connection between the alleged conduct and the asserted injury" in later stages of litigation. Id. at 114 n.29. Finally, in Havens, the Court did not discuss causation; "the question before [the Court] . . . [was] whether injury in fact ha[d] been sufficiently alleged." 455 U.S. at 376 (emphasis added). Nothing in the holdings of these cases speaks to the existence of a proximate cause requirement, let alone bars us from interpreting the FHA to require a showing of proximate cause for damages actions.

  Moreover, it seems inconceivable that the FHA would not contain a proximate cause requirement of some sort, because the alternative would produce seemingly absurd results. Requiring nothing but Article III traceability for FHA damages actions would create an open-ended fount of liability, particularly for plaintiffs (like the City of Miami) who are at least one step removed from the defendant's discriminatory conduct. This, of course, is why proximate cause is a classic element of a tort action -- and, as we have said, the Supreme Court has observed that damages claims under the FHA are essentially tort actions. Indeed, this statutory interpretation, rooted in the nature of the cause of action, has now been embraced by all three circuit courts of appeals to have addressed the issue.

"by reason of" a violation of 18 U.S.C. § 1692, see 18 U.S.C. § 1964(c)) mirrored language used in the antitrust statutes, which had long been interpreted to contain such a requirement.  See Holmes, 503 U.S. at 267-68.  One of the "central elements" of proximate cause in the RICO and antitrust context, the Court explained, is "a demand for some direct relation between the injury asserted and the injurious conduct alleged."  Id. at 268-69; see, e.g., Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 712 (11th Cir. 2014) (applying the Holmes directness requirement in a civil RICO case); cf. Lexmark, 134 S. Ct. at 1390 (appearing to endorse a directness requirement by noting that a claim "ordinarily" fails to allege proximate cause when "the harm [to the plaintiff] is purely derivative of 'misfortunes visited upon a third person by the defendant's acts'" (quoting Holmes, 503 U.S. at 268)).  The Bank argues that proximate cause in the FHA context must be the same.

But the Supreme Court in Lexmark made clear that proximate cause is not a one-size-fits-all analysis: it can differ statute by statute.  Thus, for example, Lexmark involved an allegation of false advertising under the Lanham Act brought by one company against a rival.  As the Court noted, all such injuries "are derivative of those suffered by consumers who are deceived by the advertising." 134 S. Ct. at 1391.  A claim based on such a derivative injury might not satisfy proximate cause under a statute that strictly requires a direct connection between

36

the plaintiff's harm and the defendant's conduct.  Nevertheless, the Court found

that the claim satisfied proximate causation under the Lanham Act: because the

statute authorized suit "only for commercial injuries," the derivative nature of the

plaintiff's claim could not be "fatal" to the plaintiff's cause of action.  Id.  In other

words, the statutory context shaped the proximate cause analysis.  So, too, in this

case.

The FHA's proximate cause requirement cannot take the shape of the strict

directness requirement that the Bank now urges on us: indeed, such a restriction

would run afoul of Supreme Court and Eleventh Circuit caselaw allowing entities

who have suffered indirect injuries -- that is, parties who have not themselves been

directly discriminated against -- to bring a claim under the FHA.  Notably, the

Village of Bellwood in Gladstone was permitted to bring an FHA claim even

though it was not directly discriminated against.  441 U.S. at 109-11.  So, too, was

the non-profit corporation in Havens, which alleged impairment of its

organizational mission and a drain on its resources, not direct discrimination.  455

U.S. at 378-79.  And in our own Circuit, the same is true of the plaintiff in Baytree,

a non-minority developer who challenged a city's zoning decision as racially

discriminatory.  873 F.2d at 1408-09.  Indeed, the Supreme Court in Havens

instructed that the distinction between direct and indirect harms -- or, as the

Havens Court characterized it, the difference "between 'third-party' and 'first-

party' standing" -- was "of little significance in deciding" whether a plaintiff had a cause of action under the FHA.  455 U.S. at 375; see Pac. Shores Props., 730 F.3d at 1168 n.32 ("The fact that FHA plaintiffs' injuries must be proximately caused by the defendants' discriminatory acts does not, of course, mean that defendants are not liable for foreseeable, but indirect, effects of discrimination.").

In examining RICO and the antitrust statutes, the Supreme Court has looked to the statutory text and legislative history to determine the scope and meaning of the proximate cause requirement.  See Holmes, 503 U.S. at 265-68.  Neither party has presented any argument based on these considerations.  However, the Supreme Court has observed that the language of the FHA is "broad and inclusive," Trafficante, 409 U.S. at 209, and must be given "a generous construction," id. at 212.  What's more, while the Supreme Court has cautioned that "[t]he legislative history of the [the FHA] is not too helpful" in determining the scope of its cause of action, it observed that the FHA's proponents "emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered."  Id. at 210.  In short, nothing in the text or legislative history of the FHA supports the Bank's cramped interpretation.

As we've noted, damages claims arising under the FHA have long been analogized to tort claims.  Thus, we look to the law of torts to guide our proximate cause analysis in this context.  We agree with the City that the proper standard,

38

drawing on the law of tort, is based on foreseeability.[9] See Dobbs, Hayden & Bublick, supra, § 199, at 686 ("Professional usage almost always reduces proximate cause issues to the question of foreseeability. The defendant must have been reasonably able to foresee the kind of harm that was actually suffered by the plaintiff . . ."); see also Pac. Shores Props., 730 F.3d at 1168 & n.32 (noting in the FHA context that "the doctrine of proximate cause serves merely to protect defendants from unforeseeable results" of their unlawful conduct, and that defendants are "liable for foreseeable . . . effects of discrimination.").

Under this standard, the City has made an adequate showing. The complaint alleges that the Bank had access to analytical tools as well as published reports drawing the link between predatory lending practices "and their attendant harm," such as premature foreclosure and the resulting costs to the City, including, most notably, a reduction in property tax revenues. Complaint at 8-9, 26-27, 32-33, 47-48, 50. The district court rejected the plaintiffs' claim partly because it failed to "allege facts that isolate Defendants' practices as the cause of any alleged lending disparity." City of Miami v. Bank of America Corp., 2014 WL 3362348, at *5. But as we have said even in the more restrictive RICO context, proximate cause "is not . . . the same thing as . . . sole cause." Cox v. Adm'r U.S. Steel & Carnegie, 17

---

[9] We acknowledge that the Supreme Court has rejected foreseeability as the touchstone of proximate cause "in the RICO context," Hemi Grp., LLC v. City of New York, 559 U.S. 1, 12 (2010), but we have already explained why that statutory context does not govern our analysis today.

39

F.3d 1386, 1399 (11th Cir.), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994); see Dobbs, Hayden & Bublick, supra, § 198, at 683 ("[The proximate cause requirement] does not mean that the defendant's conduct must be the only proximate cause of the plaintiff's injury."). Instead, a proximate cause is "a substantial factor in the sequence of responsible causation." Cox, 17 F.3d at 1389 (quotation omitted). The City has surely alleged that much: it claims that the Bank's discriminatory lending caused property owned by minorities to enter premature foreclosure, costing the City tax revenue and municipal expenditures. Although there are several links in that causal chain, none are unforeseeable. See Dobbs, Hayden & Bublick, supra, § 204, at 705 (explaining that intervening causes become "superseding" only if they are unforeseeable). And, as we noted in the context of Article III traceability, the City has provided the results of regression analyses that purport to draw the connection between the Bank's conduct toward minority borrowers, foreclosure, and lost tax revenue. This empirical data is sufficient to "raise the pleadings above the speculative level." Dekalb Cnty. v. HSBC N. Am. Holdings, Inc., No. 1:12-CV-03640-SCJ, 2013 WL 7874104, at *7 (N.D. Ga. Sept. 25, 2013); see Twombly, 550 U.S. at 555; cf. Maya v. Centex Corp., 658 F.3d 1060, 1073 (9th Cir. 2011) ("Expert testimony can be used to

explain the causal connection between defendants' actions and plaintiffs' injuries, even in the context of other market forces.").[10]

In the face of longstanding caselaw drawn from the Supreme Court and this Court permitting FHA claims by so-called third party plaintiffs who are injured by a defendant's discrimination against another person, it is clear that the harm the City claims to have suffered has "a sufficiently close connection to the conduct the statute prohibits."  Lexmark, 134 S. Ct. at 1390.  Of course, whether the City will be able to actually prove its causal claims is another matter altogether.  At this stage, it is enough to say that the City has adequately pled proximate case, as required by the FHA.

### 3. Statute of Limitations

---

[10] The Bank also makes much of City of Cleveland v. Ameriquest Mortgage Sec., Inc., 615 F.3d 496 (6th Cir. 2010), a Sixth Circuit case brought by the City of Cleveland against various financial entities that it claimed were responsible for a large portion of the Cleveland subprime lending market and a foreclosure crisis that devastated local neighborhoods.  Id. at 498-99.  The Sixth Circuit held that the city's claims did not adequately plead proximate cause, in part because "the cause of the alleged harms is a set of actions (neglect of property, starting fires, looting, and dealing drugs) that is completely distinct from the asserted misconduct (financing subprime loans)."  Id. at 504. The defendants insist that the same analysis applies here.  But City of Cleveland is readily distinguishable.  Most glaringly, the city in that case brought a state-law public nuisance claim, not an FHA claim.  Id. at 498.  Ohio law had adopted its proximate cause test from Holmes, which we have already explained is inapposite, and the court in no way suggested that an identical proximate cause requirement existed in the FHA.  Id. at 503.  Moreover, the defendants in that case "did not originate the subprime mortgages at issue" -- rather, they "finance[ed], purchas[ed], and pool[ed] . . . vast amounts of these loans," creating mortgage-backed securities that were then sold to the public.  Id. at 499.  It was this financial activity that Cleveland challenged as a public nuisance, not the original issuance of the loans.  Thus, the Cleveland defendants' activity was one step further removed than the activity of the Bank in this case, which issued the allegedly predatory loans in the first instance.

The FHA also requires that claims be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). The district court concluded, and the parties do not contest, that an FHA claim for issuing a discriminatory loan begins to run from the date that the loan closes. City of Miami v. Bank of America Corp., 2014 WL 3362348, at *6; see Estate of Davis v. Wells Fargo Bank, 633 F.3d 529, 532 (7th Cir. 2011) (calculating FHA statute of limitations for a predatory loan beginning with the date the loan was issued).

This lawsuit was filed on December 13, 2013. Thus, in a traditional statute of limitations analysis, the complained-of loans must have closed after December 13, 2011. The City maintains that it has alleged a pattern and practice of discriminatory lending by the Bank, and its claims, therefore, qualify for the application of the "continuing violation doctrine." The district court disagreed, finding that the City had not alleged facts sufficient to support its allegation that the specific practices continued into the statutory period. We remain unpersuaded.

The complaint alleged that the City had identified 3,326 discriminatory loans issued by the Bank in Miami between 2004 and 2012 that had resulted in foreclosure. Complaint at 50-51. It then listed ten specific property addresses that it claimed "corresponded to these foreclosures," but provided no specific information (e.g., the type of loan, the characteristics that made it predatory or

42

discriminatory, when the loan closed, when the property went into foreclosure, etc.) for each address. Id. at 51. (The City also claimed that "with the benefit of discovery," it "anticipate[d] . . . be[ing] able to identify more foreclosures resulting from the issuance of discriminatory loans." Id. at 51 n.35.) As the district court noted, however, the City failed to allege that any of the loans closed within the limitations period (between December 13, 2011, and December 13, 2013).

On appeal, the City does not contend that its original complaint was adequate; rather, it argues that it could readily cure the statute of limitations flaws if given the opportunity. In support, the City points to the proposed amended complaint that it provided along with its motion for reconsideration and motion to amend. The district court acknowledged that the City might indeed be able to remedy its statute of limitations deficiencies with an amendment, but the court never considered whether the City's proposed amended complaint was sufficient, because it concluded that the City remained outside the statute's zone of interests and had not adequately pled proximate cause. Because the district court erred both as to the zone of interests and proximate cause, we are obliged to remand the cause of action in the first instance to determine whether or not the City could remedy any statute of limitations deficiency. We decline to evaluate the City's proposed amended complaint before the district court has had the opportunity to do so. See Adinolfe v. United Techs. Corp., 768 F.3d 1161, 1172 (11th Cir. 2014) ("[A]s an

43

appellate tribunal, we are generally limited to reviewing arguments and issues that have been raised and decided in the district court.").

In order to provide guidance on remand, we offer this discussion of the application of the continuing violation doctrine to this case. In addition to noting that the City never alleged that any particular loan closed within the limitations period (a deficiency that may well be cured in an amended pleading), the district court also seemingly held that the City's claim could not qualify for the application of the continuing violation doctrine because the complaint did not identify a singular and uniform practice of continuing conduct.

The continuing violation doctrine applies to "the continued enforcement of a discriminatory policy," and allows a plaintiff to "sue on otherwise time-barred claims as long as one act of discrimination has occurred . . . during the statutory period." Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1221 (11th Cir. 2001) (per curiam). The governing law on the continuing violation doctrine in the FHA context is drawn from the Supreme Court's decision in Havens. In that case, three plaintiffs[11] -- a black individual looking to rent an apartment, a black "tester," and a white "tester"[12] -- brought FHA claims. Havens, 455 U.S. at 368. Their lawsuit was filed on January 9, 1979. Coles v. Havens Realty Corp., 633 F.2d 384, 386

---

[11] As discussed earlier, there was also a fourth plaintiff: a non-profit corporation. Havens, 455 U.S. at 367. Its claim is not relevant to the discussion of the statute of limitations.

[12] The testers posed as renters for the purpose of collecting evidence of unlawful racial steering practices.

44

(4th Cir. 1980), aff'd in part, rev'd in part sub nom. Havens, 455 U.S. 363.  At the time, the limitations period under the FHA was 180 days.  The plaintiffs identified five separate incidents of discrimination: on March 14, March 21, March 23, July 6, and July 13 of 1978.  Only the incident on July 13 was within the limitations period.  See Havens, 455 U.S. at 380.

On March 14, March 21, and March 23, the two testers asked Havens about available apartments.  Each time, the black tester was told that nothing was available, while the white tester was told that there were vacancies.  Id. at 368.  On July 6, the black tester made a further inquiry and was told that there were no vacancies, while another white tester (not a party to the suit) was told that there were openings.  Id.  Finally, on July 13 -- the only incident within the limitations period -- the black plaintiff who was genuinely looking to rent asked Havens about availability and was falsely told that there was nothing.  Id.

All three plaintiffs alleged that Havens's practices deprived them of the benefits of living in an integrated community.  Id. at 369.  The Supreme Court held that the claims were not time-barred for any of the plaintiffs because they alleged a "continuing violation" of the FHA, despite the fact that only one discriminatory incident was within the limitations window, and that incident involved only one of the three plaintiffs.  Id. at 380-81.  "[A] 'continuing violation' of the Fair Housing Act should be treated differently from one discrete act of discrimination," the

45

Court explained.  Id. at 380.  The Court reasoned that "[w]here the challenged violation is a continuing one," there is no concern about the staleness of the plaintiff's claims.  Id.  Moreover, the Court emphasized "the broad remedial intent of Congress embodied in the [Fair Housing] Act" in rejecting the defendants' "wooden application" of the statute of limitations.  Id.  The Court concluded: "where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [the limitations period, starting at] the last asserted occurrence of that practice."  Id. at 380-81.

The case before us -- if the City is able to identify FHA violations within the limitations period -- is on all fours with Havens.  The City has alleged "not just one incident . . . but an unlawful practice that continues into the limitations period."  Id. at 381.  The City alleges that the Bank has engaged in a longstanding practice of discriminatory lending in which it extends loans to minority borrowers only on more unfavorable terms than those offered to white borrowers.  The predatory qualities of the loans have taken slightly different forms over time (e.g., higher interest rates, undisclosed back-end premiums, higher fees, etc.), but the essential discriminatory practice has remained the same: predatory lending targeted at minorities in the City of Miami.  The fact that the burdensome terms have not

46

remained perfectly uniform does not make the allegedly unlawful practice any less "continuing." The various instances of discriminatory lending comprise the practice, which continues into the limitations period. At least at the pleading stage, this is enough to plausibly invoke the continuing violation doctrine. See City of Los Angeles, 2014 WL 6453808, at *7 ("The City's allegations of discrimination under the FHA relate to Chase's lending practices overall, not a specific type of loan issued. The Court finds the allegations sufficient to apply the continuing violations doctrine."); City of Los Angeles v. Citigroup Inc., 24 F. Supp. 3d 940, 952 (C.D. Cal. 2014) ("In this case, [the plaintiff] is alleging a pattern and practice of 'discriminatory lending' on the part of Defendants over at least an eight-year period. While the types of loans that Defendants allegedly issued to minority borrowers may have changed during the relevant time period, [the plaintiff] alleges that they remained high-risk and discriminatory. This is sufficient to apply the continuing-violation doctrine."); accord City of Los Angeles v. Bank of Am. Corp., No. CV 13-9046 PA (AGRx), 2014 WL 2770083, at *10 (C.D. Cal. June 12, 2014); City of Los Angeles v. Wells Fargo & Co., 22 F. Supp. 3d 1047, 1058-59 (C.D. Cal. 2014); see also Hargraves v. Capital City Mortg. Corp., 140 F. Supp. 2d 7, 17-19 (D.D.C. 2000) (applying the continuing violation doctrine to an FHA claim challenging a mortgage company's practice of predatory and discriminatory lending, where that practice took various forms, including charging exorbitant

interest rates, fraudulent fees and penalties, inadequate risk assessment, and elevated rates of foreclosure).

### 4. Remand

Resolving a plaintiff's motion to amend is "committed to the sound discretion of the district court," but that discretion "is strictly circumscribed" by Rule 15(a)(2) of the Federal Rules of Civil Procedure, which instructs that leave to amend should be "freely give[n] when justice so requires." Gramegna v. Johnson, 846 F.2d 675, 678 (11th Cir. 1988); see also Shipner v. E. Air Lines, Inc., 868 F.2d 401, 407 (11th Cir. 1989) ("[U]nless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial").

As we have explained, we find that the City is within the FHA's zone of interests and has sufficiently alleged proximate causation between its injury and the Bank's conduct. The district court's refusal to allow the City to amend, and its conclusion that any amended complaint would be futile, was legal error and therefore an abuse of discretion. On remand, the City should be granted leave to amend its complaint.

We also note that while this appeal was pending, the Supreme Court handed down a decision that may materially affect the resolution of this case. In Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015), a non-profit organization brought a Fair Housing Act

48

claim against the Texas Department of Housing and Community Affairs, alleging that the Department's allocation of low-income housing tax credits caused racial segregation by "granting too many credits for housing in predominantly black inner-city areas and too few in predominantly white suburban neighborhoods." Id. at 2514. The claim was brought on a disparate-impact theory, alleging not that the Department's practice was driven by a discriminatory intent, but rather that it had a "'disproportionately adverse effect on minorities' and [was] otherwise unjustified by a legitimate rationale." Id. at 2513 (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009)). The question before the Court was whether disparate-impact claims are cognizable under the FHA. The Court held that they are. Id. at 2525.

However, in dicta, the Court announced the "proper[] limit[s]" on disparate impact liability under the FHA, needed both to avoid serious constitutional issues and to protect potential defendants from abusive disparate-impact claims. Id. at 2522; see id. at 2522-24. Specifically, the Court noted that defendants must be allowed to "explain the valid interest served by their [challenged] policies," id. at 2522, and that courts should insist on a "robust causality requirement" at the "prima facie stage" linking the defendant's conduct to the racial disparity, id. at 2523. The Court emphasized that disparate-impact claims must be aimed at "removing artificial, arbitrary, and unnecessary barriers," rather than "displac[ing] valid governmental and private priorities." Id. at 2524 (quoting Griggs v. Duke

49

Power Co., 401 U.S. 424, 431 (1971)) (alterations adopted).  Any newly pled complaint must take into account the evolving law on disparate impact in the FHA context.  Without the new pleadings before us, we have no occasion to pass judgment on how Inclusive Communities will impact this case, but we flag the issue both for the parties and for the district court on remand.

## C. Unjust Enrichment Claim

As for the City's state law unjust enrichment claim, we agree with the district court and affirm its ruling.  In deciding this claim, we are obliged to apply Florida's substantive law.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  Where the highest state court has not provided the definitive answer to a question of state law, "we must predict how the highest court would decide this case," looking to the decisions of the lower state courts for guidance. See Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011).  Under Florida law, the doctrine of unjust enrichment (sometimes called a "contract implied in law," "quasi-contract," and various other terms) governs the situation in which one party has conferred a valuable benefit on another in the absence of a contract, but "under circumstances that ma[ke] it unjust to retain it without giving compensation."  See Magwood v. Tate, 835 So. 2d 1241, 1243 (Fla. Dist. Ct. App. 2003) (quoting Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co., 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997)).  There are three elements of an unjust

50

enrichment claim under Florida law: first, the plaintiff has conferred a benefit on the defendant; second, the defendant voluntarily accepted and retained that benefit; and, finally, the circumstances are such that it would be inequitable for the defendants to retain the benefit without paying for it. Virgilio v. Ryland Grp., Inc., 680 F.3d 1329, 1337 (11th Cir. 2012) (citing Fla. Power Corp. v. City of Winter Park, 887 So. 2d 1237, 1241 n.4 (Fla. 2004)). As for the first element, the benefit must be conferred directly from the plaintiff to the defendant. Century Senior Servs. v. Consumer Health Ben. Ass'n, Inc., 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011) (citing Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A., 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996)). "At the core of the law of restitution and unjust enrichment is the principle that a party who has been unjustly enriched at the expense of another is required to make restitution to the other." Gonzalez v. Eagle Ins. Co., 948 So. 2d 1, 3 (Fla. Dist. Ct. App. 2006).

The City alleged that the Bank "received and utilized benefits derived from a variety of municipal services, including police and fire protection, as well as zoning ordinances, tax laws, and other laws and services that have enabled [the Bank] to operate and profit within the City of Miami." Complaint at 54. It went on to allege that "[a]s a direct and proximate result of [the Bank's] predatory lending practices, [the Bank] ha[s] been enriched at the City's expense" by utilizing those benefits while denying the City tax revenue and costing it in

51

additional municipal expenditures required to address foreclosed properties. The Bank "failed to remit those wrongfully obtained benefits," the complaint claimed. The City also alleged that it had paid for the Bank's externalities (the costs of the harm caused by the discriminatory lending patterns), that the Bank was aware of this benefit, and that its retention would be unjust. Id. at 55.

The district court dismissed the claim without prejudice, in part because the City had not alleged that it had conferred a direct benefit onto the Bank to which they were not otherwise legally entitled, as required under Florida law. As for the denied tax revenues, the district court noted that such a denial is not a direct benefit conferred on the Bank by the City. As for the municipal services, the district court found that they did not create an unjust enrichment claim for two reasons. First, the municipal services were not benefits conferred directly on the Bank -- the services were provided to the residents of Miami, not to the Bank, and any benefit the Bank received was merely derivative. Second, the City had not adequately alleged that the Bank, as a Miami property owner, was not legally entitled to those services. We agree.

The City maintains that its complaint states a cause of action under Florida law, but it has not cited to a single Florida case. The City relies primarily on White v. Smith & Wesson Corp., 97 F. Supp. 2d 816 (N.D. Ohio 2000), where the mayor and City of Cleveland sued various gun manufacturers and dealers alleging, inter

52

alia, unjust enrichment on the ground that the city had conferred a benefit on the defendants by paying for their "externalities": "the costs of the harm caused by Defendants' failure to incorporate safety devices into their handguns and negligent marketing practices." Id. at 829. The Ohio law of unjust enrichment essentially tracks Florida law. See id. ("In order to maintain a cause of action for unjust enrichment under Ohio law, a plaintiff must allege: (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and, (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."). Without citing to a single Ohio state court case in its unjust enrichment analysis, the district court determined that plaintiffs had stated such a claim under Ohio law.

The City cites only two other cases, neither of which were from Florida. See City of Boston v. Smith & Wesson Corp., No. 199902590, 2000 WL 1473568, at *18 (Mass. Super. Ct. July 13, 2000) (allowing an unjust enrichment claim against gun manufacturers under Massachusetts law on the same reasoning as was employed in White); City of New York v. Lead Indus. Ass'n, Inc., 190 A.D.2d 173, 177 (N.Y. App. Div. 1993) (permitting the City of New York's claim for restitution against manufacturers of lead-based paint for the City's expenditures in abating the hazard of lead-based paint and treating the victims). None of these cases, obviously, governs our application of Florida law.

53

We have not found any case -- and the City has provided none -- supporting an unjust enrichment claim of this type under Florida law.  First, the City alleges that the Bank must pay the City for the tax revenue the City has been denied due to the Bank's unlawful lending practices.  Although a deprivation of tax revenue may create an injury in fact under Article III, such an injury does not fit within the unjust enrichment framework.  The missing tax revenue is in no way a benefit that the City has conferred on the Bank.  The City has provided no explanation for this incongruity on appeal.

Instead, the City focuses on the municipal services -- including police, firefighters, zoning ordinances, and tax laws -- that it claims it would not have had to provide if not for the Bank's predatory lending.  But this version of the unjust enrichment claim fares no better, for three independent reasons.  For starters, it's not clear that municipal expenditures are among the types of benefits that can be recovered by unjust enrichment under Florida law.  We have found no Florida case in which a municipality recovered its expenditures on an unjust enrichment theory.  Indeed, at least one case suggests that a municipality cannot recover such expenditures without express statutory authorization, which the City has never alleged.  See Penelas v. Arms Tech., Inc., No. 99-1941 CA-06, 1999 WL 1204353, at *2 (Fla. Cir. Ct. Dec. 13, 1999) ("[T]he County's claim for damages, based on the costs to provide 911, police, fire and emergency services effectively seeks

54

reimbursement for expenditures made in its performance of governmental functions.  Costs of such services are not, without express legislative authorization, recoverable by governmental entities."), aff'd, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001).

Moreover, the benefits provided by these municipal services were not directly conferred on the Bank, as is required for an unjust enrichment claim under Florida law.  See, e.g., Virgilio, 680 F.3d at 1337 (affirming the dismissal of an unjust enrichment claim under Florida law because the plaintiffs only "'indirectly' conferred a benefit on Defendants"); Extraordinary Title Servs. v. Fla. Power & Light Co., 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009) (affirming the dismissal of an unjust enrichment claim because the plaintiff "ha[d] not conferred a direct benefit" on the defendant).  As the district court correctly noted, municipal police and fire services directly benefit the residents and owners of homes in the City of Miami, not the financial institution that holds the loans on those properties.  And tax laws and zoning ordinances are quite clearly not direct benefits conferred on Bank of America: they are laws of general applicability that, indeed, apply to all residents of Miami.  No Florida caselaw suggests that these benefits are direct enough to sustain an unjust enrichment claim.

Finally, the City has failed to allege facts to show that circumstances are such that it would be inequitable for the Bank to retain such benefits without

55

compensation.  Even assuming that these municipal services did confer a cognizable benefit on the Bank as the owner of foreclosed property, the City does not challenge the district court's determination that the Bank was legally entitled to those services.  Cf. State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, 739 F.3d 579, 584 (11th Cir. 2013) ("If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment.").  The City has provided no arguments and cited no Florida caselaw explaining why the Bank would not be entitled to police and fire protection like any other property owner.

The Florida Supreme Court has not ruled on whether an unjust enrichment claim exists under these circumstances.  But given the complete lack of supporting Florida caselaw, we decline to invent a novel basis for unjust enrichment under Florida law today.  Accordingly, we affirm the district court's order dismissing the City's unjust enrichment claim.

## IV. Conclusion

Nothing we have said in this opinion should be taken to pass judgment on the ultimate success of the City's claims.  We hold only that the City has constitutional standing to bring its FHA claims, and that the district court erred in dismissing those claims with prejudice on the basis of a zone of interests analysis,

56

a proximate cause analysis, or the inapplicability of the continuing violation doctrine.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.