[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14544
_____

D.C. Docket No. 1:13-cv-24508-WPD

CITY OF MIAMI,
a Florida municipal corporation,

Plaintiff - Appellant,

versus

WELLS FARGO & CO.,
WELLS FARGO BANK, N.A.,

Defendants - Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(September 1, 2015)

Before MARCUS and WILSON, Circuit Judges, and SCHLESINGER,[*] District
Judge.

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

MARCUS, Circuit Judge:

On December 13, 2011, the City of Miami brought three separate fair housing lawsuits against Wells Fargo, Bank of America, and Citigroup.  Each alleged that the bank in question had engaged in a decade-long pattern of discriminatory lending by targeting minorities for predatory loans.  The complaints in each case were largely identical, each identifying the same pattern of behavior and supported by empirical data specific to each defendant.  Moreover, each complaint contained the same two causes of action: one claim arising under the Fair Housing Act (FHA), 42 U.S.C. § 3601 et seq., as well as an attendant unjust enrichment claim under Florida law.

The three cases were heard by the same judge in the Southern District of Florida, and were resolved in the same way based on the district court's order in the Bank of America case.  In this case, like the others, the district court dismissed the City's FHA claim with prejudice on three grounds: the City lacked statutory standing under the FHA because its alleged injuries fell outside the statute's "zone of interests"; the City had not adequately pled that Wells Fargo's conduct proximately caused the harm sustained by the City; and, finally, the City had run afoul of the statute of limitations and could not employ the continuing violation doctrine.  Each of the three cases was appealed separately.

2

After thorough review, we are constrained to disagree with the district court's legal conclusions about the City's FHA claims. The most detailed account of our reasoning is set out in the companion case City of Miami v. Bank of America Corp., No. 14-14543. The same conclusions of law apply here. As a preliminary matter, we find that the City has constitutional standing to pursue its FHA claims. Furthermore, under controlling Supreme Court precedent, the "zone of interests" for the Fair Housing Act extends as broadly as permitted under Article III of the Constitution, and therefore encompasses the City's claim. While we agree with the district court's conclusion that the FHA contains a proximate cause requirement, we find that the City has adequately alleged proximate cause. Finally, the "continuing violation doctrine" would apply to the City's claims, if they are adequately pled.

Because the district court imposed too stringent a zone of interests test and wrongly applied the proximate cause analysis, it erred in dismissing the City's federal claims with prejudice and in denying the City's motion for leave to amend on the grounds of futility. As for the state law claim, we affirm the dismissal because the benefits the City allegedly conferred on the defendants were not sufficiently direct to plead an unjust enrichment claim under Florida law.

I.

On December 13, 2013, the City of Miami brought this complex civil rights action in the United States District Court for the Southern District of Florida against Wells Fargo & Co. and Wells Fargo Bank, N.A. (collectively "Wells Fargo" or "the Bank") containing two claims.  First, it alleged that the defendants violated sections 3604(b)[1] and 3605(a)[2] of the Fair Housing Act by engaging in discriminatory mortgage lending practices that resulted in a disproportionate and excessive number of defaults by minority homebuyers and caused financial harm to the City.  Complaint for Violations of the Federal Fair Housing Act at 60, City of Miami v. Wells Fargo & Co., No. 13-24508-CIV (S.D. Fla. July 9, 2014) ("Complaint").  It also alleged that the Bank unjustly enriched itself by taking advantage of "benefits conferred by the City" while, at the same time, engaging in unlawful lending practices, which "denied the City revenues it had properly expected through property and other tax payments and . . . cost[] the City additional monies for services it would not have had to provide . . . absent [the Bank's] unlawful activities."  Id. at 61.

---

[1] 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

[2] "It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).  A "residential real estate-related transaction" includes "[t]he making or purchasing of loans . . . for purchasing, constructing, improving, repairing, or maintaining a dwelling; or secured by residential real estate."  Id. § 3605(b)(1).

4

This complaint accused Wells Fargo of engaging in both "redlining" and "reverse redlining."  Redlining is the practice of refusing to extend mortgage credit to minority borrowers on equal terms as to non-minority borrowers.  Reverse redlining is the practice of extending mortgage credit on exploitative terms to minority borrowers.  Id. at 3.  The City alleged that the bank engaged in a vicious cycle: first it "refused to extend credit to minority borrowers when compared to white borrowers," then "when the Bank did extend credit, it did so on predatory terms."  Id. at 4.  When minority borrowers then attempted to refinance their predatory loans, they "discover[ed] that [the Bank] refused to extend credit at all, or on equal terms as refinancing similar loans issued to white borrowers."  Id. at 5.

The City claimed that this pattern of providing more onerous loans -- i.e., those containing more risk, carrying steeper fees, and having higher costs -- to black and Latino borrowers (as compared to white borrowers of identical creditworthiness) manifested itself in the Bank's product placements and its wholesale mortgage broker fees.  Id. at 17-26.  It also averred that the Bank's internal loan officer and broker compensation systems encouraged its employees to give out these types of loans even when they were not justified by the borrower's creditworthiness.  See id. at 19-20, 31-32.

The City said that the Bank's conduct violated the Fair Housing Act in two ways.  First, the Bank intentionally discriminated against minority borrowers by

5

targeting them for loans with burdensome terms. Id. at 35-40. And second, the Bank's conduct had a disparate impact on minority borrowers, resulting in a disproportionate number of foreclosures on minority-owned properties, and a disproportionate number of exploitative loans in minority neighborhoods. Id. at 27-35.

The City employed statistical analyses to draw the alleged link between the race of the borrowers, the terms of the loans, and the subsequent foreclosure rate of the underlying properties. Drawing on data reported by the Bank about loans originating in Miami from 2004-2012, the City claimed that a Wells Fargo loan in a predominantly (greater than 90%) minority neighborhood of Miami was 6.975 times more likely to result in foreclosure than such a loan in a majority-white neighborhood. Id. at 47. According to the City's regression analysis (which purported to control for objective risk characteristics such as credit history, loan-to-value ratio, and loan-to-income ratio), a black Wells Fargo borrower in Miami was 4.321 times more likely to receive a loan with "predatory" features[3] than a white borrower, and a Latino borrower was 1.576 times more likely to receive such a loan. Id. at 6. Moreover, black Wells Fargo borrowers with FICO scores over

---

[3] The City identified as "predatory" those loans containing features such as high-cost loans (i.e., those with an interest rate that was at least three percentage points above a federally established benchmark), subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, and adjustable rate mortgages with teaser rates (i.e., a lifetime maximum rate greater than the initial rate plus 6%). Complaint at 40-41.

660 (indicating good credit) in Miami were 2.572 times more likely to receive a predatory loan than white borrowers, while a Latino borrower was 1.875 times more likely to receive such a loan.  Id.

The City's data also suggested that from 2004-2012, 11.1% of loans made by Bank of America to black and Latino customers in Miami were high-cost, compared to just 3.2% of loans made to white customers.  Id. at 41.  Data cited in the complaint showed significantly elevated rates of foreclosure for loans in minority neighborhoods.  While 50.5% of Wells Fargo's Miami loan originations were in "census tracts" that are at least 75% black or Latino, 63.9% of loan originations that had entered foreclosure by June 2013 were from such census tracks.  Id. at 46.  Likewise, 24.3% of Wells Fargo's loans in predominantly black or Latino neighborhoods resulted in foreclosure, compared to only 4.4% of its loans in non-minority (at least 50% white) neighborhoods.  Id. at 47.

The complaint also alleged that the bank's loans to minorities resulted in especially quick foreclosures.[4]  The average time to foreclosure for Wells Fargo's black and Latino borrowers was 2.996 years, while for white borrowers it was 3.266 years.  Id. at 49.  The City also gathered data from various non-Miami-based studies (some nationwide, some based on case studies in other cities) to

---

[4] A joint report from the Department of Housing and Urban Development and the Department of the Treasury noted that time to foreclosure is an important indicator of predatory practices: "[t]he speed with which the subprime loans in these communities have gone to foreclosure suggests that some lenders may be making mortgage loans to borrowers who did not have the ability to repay those loans at the time of origination."  Complaint at 50.

7

demonstrate the elevated prevalence of foreclosure, predatory loan practices, and higher interest rates among black and Latino borrowers, and the foreseeability of foreclosures arising from predatory lending practices and their attendant harm. Id. at 27-31.

The City's charges were further amplified by the statements of several confidential witnesses who claimed that the Bank deliberately targeted black and Latino borrowers for predatory loans. For example, one former loan officer attested that Wells Fargo management steered low- and middle-income borrowers away from less expensive Community Reinvestment Act loans and toward more expensive Fair Housing Act and Freddie Mac loans. Id. at 36. Another claimed that the Bank targeted minority churches and their congregations for subprime loans. Id. at 37. A third claimed that Hispanic borrowers' applications for refinancing were disproportionately denied: "a Rodriguez in the last name was treated differently than a Smith," he stated. Id. at 39. The witness also claimed that loan officers would not fully inform low- and middle-income Hispanic customers of the financial repercussions of their mortgages, and would submit false documents that exaggerated the borrowers' incomes in order to place them in loans that they should not have qualified for. Id. at 40. One witness also alleged that the Bank would change its paperwork to disguise which branches were originating loans to minorities in order to avoid federal scrutiny. Id. at 39-40.

8

The City sought damages based on reduced property tax revenues. Id. at 52. It claimed that the Bank's lending policies caused minority-owned property to fall into unnecessary or premature foreclosure. The foreclosed-upon properties lost substantial value and, in turn, decreased the value of the surrounding properties, thereby depriving the City of property tax revenue. Id. at 52-53. The City alleged that "Hedonic regression" techniques could be used to quantify the losses the City suffered that were attributable to the Bank's conduct. Id. at 53-55. The City also sought damages based on the cost of the increased municipal services it provided to deal with the problems attending the foreclosed and often vacant properties -- including police, firefighters, building inspectors, debris collectors, and others. These increased services, the City claimed, would not have been necessary if the properties had not been foreclosed upon due to the Bank's discriminatory lending practices. Id. at 55-57. The City also sought a declaratory judgment that the Bank's conduct violated the FHA, an injunction barring the Bank from engaging in similar conduct, and punitive damages, as well as attorneys' fees. Id. at 62.

On July 9, 2014, the district court granted defendants' motion to dismiss, adopting and incorporating its order from the companion case between the City of Miami and Bank of America. First, the court found that the City of Miami lacked statutory standing to sue under the FHA. The court determined that, based on this Court's earlier opinion in Nasser v. City of Homewood, 671 F.2d 432 (11th Cir.

9

1982), the City's claim fell outside the FHA's "zone of interests," and, therefore, the City lacked standing to sue. In particular, the trial court determined that the City had alleged "merely economic injuries" that were not "affected by a racial interest." Like the plaintiffs in <u>Nasser</u>, the court suggested, the City was seeking redress under the FHA for "an economic loss from a decrease in property values," and as with the plaintiffs in <u>Nasser</u>, this was insufficient. The City's goal went far beyond the purpose of the FHA, which is to "provide, within constitutional limitations, for fair housing throughout the United States." <u>City of Miami v. Bank of America Corp.</u>, No. 13-24506-CIV, 2014 WL 3362348, at *4 (S.D. Fla. July 9, 2014) (quoting 42 U.S.C. § 3601).

The court also concluded that the FHA contains a proximate cause requirement, but that the City had not adequately pled proximate cause. The City had not sufficiently traced any lending disparities to the defendants' conduct, as opposed to confounding background variables such as "a historic drop in home prices and a global recession," and "the decisions and actions of third parties, such as loan services, government entities, competing sellers, and uninterested buyers." <u>Id.</u> at *5. The court also determined that the City had not shown that the Bank's mortgage practices caused the City any harm. It was unimpressed with the "statistics and studies" the City cited, noting that some were not based on data from Miami, some were not limited to the defendants' practices, and others "d[id]

10

not control for relevant credit factors that undoubtedly affect lending practices." Id. Moreover, some of the harm to the City stemmed directly from "the actions of intervening actors such as squatters, vandals or criminals that damaged foreclosed properties." Id.

The district court also concluded that the City's federal claim ran afoul of the statute of limitations. It noted that for the FHA, a plaintiff must bring his claim "not later than 2 years after the occurrence" of the discriminatory housing practice, and that for discriminatory loans the statute of limitations begins to run from the date of the loan closing. But the City had not alleged that any loans were made later than 2008, a full five years before its complaint was filed. The court was not persuaded by the City's invocation of the continuing violation doctrine -- which can allow plaintiffs, under some circumstances, to sue on an otherwise time-barred claim -- since the City had not alleged sufficient facts to support any claim that the specific practices continued into the statutory period. The district court dismissed the City's FHA claim with prejudice, reasoning that even if the statute of limitations deficiencies could be cured by an amended pleading, the City's lack of statutory standing could not be.

Finally, the district court rejected the City's unjust enrichment claim on several grounds. As a preliminary matter, the City had failed to draw the necessary causal connection between the Bank's alleged discriminatory practices and its

11

receipt of undeserved municipal services. Moreover, the City had failed to allege basic elements of an unjust enrichment claim under Florida law. The court determined that any benefit the Bank received from municipal services was not direct but "derivative" and, therefore, insufficient to support an unjust enrichment claim. Moreover, the City had failed to allege that the Bank was not otherwise entitled to those services as a Miami property owner. Finally, the court rejected the City's argument that Miami was forced to pay for the Bank's externalities (the costs of the harm caused by its predatory lending), holding that paying for externalities cannot sustain an unjust enrichment claim. The unjust enrichment claim was dismissed without prejudice, leaving the City free to amend its complaint.

The City chose not to proceed on its unjust enrichment claim alone "because the two claims are so intimately entwined and based on largely the same underlying misconduct." Instead, it moved for reconsideration and for leave to file an amended complaint, arguing that it had standing under the FHA and that the amended complaint would cure any statute of limitations deficiency. The proposed amended complaint alleged that the Bank's discriminatory lending practices "frustrate[] the City's longstanding and active interest in promoting fair housing and securing the benefits of an integrated community," thereby "directly interfer[ing]" with one of the City's missions. First Amended Complaint for

12

Violations of the Federal Fair Housing Act at 44, City of Miami v. Wells Fargo & Co., No. 13-24508-CIV (S.D. Fla. Sept. 9, 2014) ("Amended Complaint"). It also made more detailed allegations about properties that had been foreclosed upon after being subject to discriminatory loans. Specifically, the proposed amended complaint identified ten foreclosed properties that corresponded to predatory loans that originated between 2004 and 2012. Id. at 49. Notably, it also identified 11 properties[5] that corresponded to predatory loans that the Bank had issued after December 13, 2011 (within two years of filing the suit) that had not yet been foreclosed upon but were likely to "eventually enter the foreclosure process," based on expert analysis. Id. at 49-50.

The district court denied the City's motion for reconsideration and for leave to amend, as it did in each of the companion cases, relying upon its reasoning in the Bank of America case.

The City timely appealed the court's final order of dismissal.

## II.

As explained, our reasoning is set forth in detail in the companion case Bank of America Corp., No. 14-14543. Our legal conclusions in that case apply equally here, and dictate the same results. We briefly summarize those conclusions.

---

[5] Those addresses are: 2172 NW 17th St., Unit 74, 33125; 1000 NW 32nd Ct., 33125; 2011 NW 3rd St., 33125; 260 NW 58th Ct., 33126; 260 SW 27th Rd., 33129; 2635 SW 25th Ave., 33133; 3241 Oak Ave., 33133; 1798 SW 3rd St., 33135; 2725 SW 6th St., 33135; 1399 NW 51st St., 33142; and 1544 NW 34th St., 33142. Amended Complaint at 49-50.

13

A. Standard of Review

We review the district court's grant of a motion to dismiss with prejudice de novo, "accepting the [factual] allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Mills v. Foremost Ins. Co., 511 F.3d 1300, 1303 (11th Cir. 2008) (quotation omitted). We generally review the district court's decision to deny leave to amend for an abuse of discretion, but we will review de novo an order denying leave to amend on the grounds of futility, because it is a conclusion of law that an amended complaint would necessarily fail. Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla., 641 F.3d 1259, 1264 (11th Cir. 2011). Finally, we review de novo whether plaintiffs have Article III standing. Ga. Latino Alliance for Human Rights v. Governor of Ga., 691 F.3d 1250, 1257 (11th Cir. 2012).

B. Fair Housing Act Claim

1. Article III Standing

For the reasons we set forth in Bank of America Corp., No. 14-14543, the City has constitutional standing to bring its FHA claim. Just as in that case, the City here claims injury on the basis of lost property tax revenue due to premature or unnecessary foreclosure resulting from predatory loans. In Gladstone Realtors v. Village of Bellwood, 441 U.S. 91 (1979), the Supreme Court held that a village had Article III standing to bring an FHA claim for discriminatory renting practices

14

partly on the basis of "[a] significant reduction in property values," because such a reduction "directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." Id. at 110-11.  The City of Miami alleges the same kind of injury here. Thus, like the Village of Bellwood, the City of Miami had adequately alleged an injury in fact.

As for Article III causation, again, we find that at this stage in the proceeding the City's alleged chain of causation is perfectly plausible: taking the City's allegations as true, the Bank's extensive pattern of discriminatory lending led to substantially more defaults on its predatory loans, leading to a higher rate of foreclosure on minority-owned property and thereby reducing the City's tax base. Moreover, the complaint supports its allegations with regression analyses that link the Bank's treatment of minority borrowers to predatory loans, predatory loans to foreclosure, and foreclosure to reduced tax revenue.  All told, the City has "allege[d] . . . facts essential to show jurisdiction." FW/PBS, 493 U.S. at 231 (quoting McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).

2. "Statutory Standing"

15

The district court dismissed the City's claim because it lacked what the court characterized as "statutory standing."[6] It found that the City fell outside the FHA's "zone of interests," and that its harm was not proximately caused by the Bank's actions. Ultimately, for the reasons fully explained in Bank of America Corp., No. 14-14543, we disagree with the district court's legal conclusions.

### a. Zone of Interests

This case, too, requires us to define the breadth of the term "aggrieved person" as it is used in the FHA. See 42 U.S.C. § 3613(a)(1)(A). As explained in detail in the companion case, we are bound by the Supreme Court's interpretation of the FHA in Trafficante v. Metropolitan Life Insurance, 409 U.S. 205 (1972), Gladstone, 441 U.S. 91, and Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982): statutory standing "under [the FHA] . . . is 'as broad as is permitted by Article III of the Constitution.'"" Gladstone, 441 U.S. at 109 (quoting Trafficante, 409 U.S. at 209) (alteration adopted); accord Havens, 455 U.S. at 372. Although the Supreme Court has suggested that it may be prepared to reconsider that holding, see Thompson v. North American Stainless, LP., 562 U.S. 170, 175-78

---

[6] As noted in the companion case, the Supreme Court has discarded the doctrinal label of "statutory standing" (sometimes also called "prudential standing"). See Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1387 & n.4 (2014). The Court clarified that the proper inquiry is whether the plaintiff "has a cause of action under the statute," id. at 1387, which is "a straightforward question of statutory interpretation," id. at 1388. The inquiry isn't a matter of standing, because "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." Id. at 1387 n.4 (quoting Verizon Md. Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 642–643 (2002)).

(2011), we must "follow the case which directly controls, leaving to the Supreme Court[] the prerogative of overruling its own decisions." Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1263 (11th Cir. 2012) (quotation omitted and alteration adopted); accord Tenet v. Doe, 544 U.S. 1, 10-11 (2005).  Moreover, our circuit precedent in Nasser, 671 F.2d 432, is not to the contrary; that case stands for the unremarkable proposition that a plaintiff has no cause of action under the FHA if he makes no allegation of discrimination (or disparate impact) on the basis of race (or one of the FHA's other protected characteristics: color, religion, sex, handicap, familial status, and national origin).  In this case, however, the complaint explicitly alleged race-based discrimination in the Bank's predatory lending practices.

Thus, we agree with the City that the term "aggrieved person" in the FHA sweeps as broadly as allowed under Article III.  To the extent a zone of interests analysis applies to the FHA, it encompasses the City's allegations in this case.

### b. Proximate Cause

As we explained at some length in the companion case, we agree with the district court that a plaintiff bringing an action for damages under the Fair Housing Act must plead proximate cause between his injury and the defendant's unlawful conduct.  The Supreme Court has instructed that such a claim is "in effect, a tort action," governed by general tort rules, Meyer v. Holley, 537 U.S. 280, 285 (2003),

17

and proximate cause is a classic element of a tort claim, see Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 198 (2d ed. 2011).

And we look to the law of torts to guide our proximate cause analysis, using foreseeability as our touchstone.  Under this standard, we conclude again that the City has made an adequate showing.  Proximate cause "is not . . . the same thing as . . . sole cause."  Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1399 (11th Cir.), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994), and the fact that there are multiple plausible, foreseeable links in the alleged causal chain is not fatal to the City's claim.

### 3. Statute of Limitations and Remand

The district court dismissed the City's FHA claims with prejudice (and denied its motion for leave to amend) because it concluded that the City fell outside the statute's zone of interests and had not adequately pled proximate cause, and that these deficiencies were incurable.  Resolving a plaintiff's motion to amend is "committed to the sound discretion of the district court," but that discretion "is strictly circumscribed" by Rule 15(a)(2) of the Federal Rules of Civil Procedure, which instructs that leave to amend should be "freely give[n] when justice so requires."  Gramegna v. Johnson, 846 F.2d 675, 678 (11th Cir. 1988).  Because the district court wrongly concluded that the City was outside the FHA's zone of interests and had not adequately pled proximate cause, its determination that any

18

amended complaint would be futile was legal error and therefore an abuse of discretion. On remand, the City should be granted leave to amend its complaint.

In its original complaint, the City failed to allege that any of the offending loans closed within the limitations period (between December 13, 2011, and December 13, 2013). On appeal, the City does not contend that its original complaint was adequate; rather, it argues that it could readily cure the statute of limitations flaws if given the opportunity. The City points to its proposed amended complaint for support, in which it identified five specific properties corresponding to predatory loans issued after December 13, 2011. Amended Complaint at 49-50. On remand, the district court will have the opportunity to evaluate whether the City's new pleadings satisfy the statute of limitations, in a manner consistent with our explanation of the continuing violation doctrine in the companion case.

## B. Unjust Enrichment Claim

As for the City's state law unjust enrichment claim, we agree with the district court and affirm its ruling for the reasons detailed in the companion case. We have not found -- and the City has not provided -- a single Florida case supporting an unjust enrichment claim in these circumstances, and the City's claims do not fit within an unjust enrichment framework. Missing tax revenue is in no way a benefit that the City has conferred on the Bank. Municipal expenditures, meanwhile, do not appear to be among the types of benefits that can

be recovered in an unjust enrichment action under Florida law.  See Penelas v. Arms Tech., Inc., No. 99-1941 CA-06, 1999 WL 1204353, at *2 (Fla. Cir. Ct. Dec. 13, 1999) ("[T]he County's claim for damages, based on the costs to provide 911, police, fire and emergency services effectively seeks reimbursement for expenditures made in its performance of governmental functions.  Costs of such services are not, without express legislative authorization, recoverable by governmental entities."), aff'd, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001).  They are also not a benefit directly conferred on the Bank, as is required for an unjust enrichment claim under Florida law.  See, e.g., Extraordinary Title Servs. v. Fla. Power & Light Co., 1 So. 3d 400, 404 (Fla. Dist. Ct. App. 2009) (affirming the dismissal of an unjust enrichment claim because the plaintiff "ha[d] not conferred a direct benefit" on the defendant).  Finally, the City has provided no arguments and cited no Florida caselaw explaining why the Bank would not be entitled to such services like any other property owner.  Cf. State Farm Fire & Cas. Co. v. Silver Star Health & Rehab, 739 F.3d 579, 584 (11th Cir. 2013) ("If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment.").

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.