**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RICHARD SCOTT JACKSON,

     Plaintiff - Appellee,

v.

RICHARD BESECKER, in his official
capacity as Sheriff of Gunnison
County, Colorado,

     Defendant - Appellant.

No. 16-1392
(D.C. No. 1:15-CV-01182-JLK)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **MURPHY**, and **BACHARACH**, Circuit Judges.

Defendant-Appellant Richard Besecker ("Sheriff Besecker") appeals from

the district court's denial of his motion for summary judgment based on qualified

immunity. Order, Jackson v. Besecker, No. 15-cv-1182-JLK (D. Colo. Sept. 15,

2016) (unpublished), ECF No. 50; see also 3 Aplt. App. 611–14. We dismiss this

appeal for lack of jurisdiction.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

## Background

In February 2014, Plaintiff-Appellee Richard Jackson, a deputy sheriff in Gunnison County, Colorado, announced that he was running for sheriff. This position was occupied by his boss, Sheriff Besecker, who opted to run for reelection. Sheriff Besecker won the election and then fired Mr. Jackson in March 2015. Mr. Jackson instituted this action under 42 U.S.C. § 1983. He claims that Sheriff Besecker terminated him in retaliation for running against him in violation of his First Amendment rights of free speech and freedom of association. Sheriff Besecker moved for summary judgment on the basis of qualified immunity.

The district court held that Sheriff Besecker was not entitled to qualified immunity because material facts were disputed. 3 Aplt. App. 612–13. But the district court did not assume any facts regarding any disruption the election may have caused in the sheriff's office. Nor did the court conduct any sort of legal analysis to that end. Sheriff Besecker filed a notice of interlocutory appeal.

## Discussion

We generally only have jurisdiction over final orders made by district courts. 28 U.S.C. § 1291. However, we may review a non-final order denying qualified immunity if it "turns on an issue of law." Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We "lack interlocutory jurisdiction to review a district court

ruling denying summary judgment for a defendant on a qualified immunity defense on the ground that there are disputed issues of material fact." Sevier v. City of Lawrence, 60 F.3d 695, 700 (10th Cir. 1995); see also Johnson v. Jones, 515 U.S. 304, 319–20 (1995). Qualified immunity appeals are appropriate for "neat abstract issues of law." Id. at 317. They are not appropriate when the issue revolves only around whether a party can prove a set of facts supporting his or her claim.

There are genuine issues of material fact regarding any potential or actual disruption at the sheriff's office. Compare Aplt. Br. at 13–15, with Aplee. Br. at 18–26. These factual disputes prevent resolution of this matter under the multi-factored Garcetti/Pickering test. See Dixon v. Kirkpatrick, 553 F.3d 1294, 1301–02 (10th Cir. 2009). See generally Garcetti v. Ceballos, 547 U.S. 410 (2006); Pickering v. Bd. of Educ., 391 U.S. 563 (1968). This was why the district court denied qualified immunity. 3 Aplt. App. 612–13. We therefore do not have jurisdiction. See Johnson, 515 U.S. at 319–20.

The dissent suggests conducting a de novo review of the record because the district court did not discuss whether a reasonable fact-finder could conclude that the campaign caused disruption in the sheriff's office. See Dissent Op. at 3–5 (citing Lewis v. Tripp, 604 F.3d 1221, 1224–26 (10th Cir. 2010) (Gorsuch, J.)). Johnson suggests that we may review the record de novo to determine what facts the district court likely assumed, but only "when it denied summary judgment for

[a] (purely legal) reason." 515 U.S. at 319. Our reading of the district court's orders is that a reasonable jury could find there was no disruption in the sheriff's office, and the termination was therefore motivated by Mr. Jackson's decision to run against Sheriff Besecker. While it is true that we can address whether a right is clearly established, Sheriff Besecker does not argue that he is entitled to qualified immunity under the facts developed by Mr. Jackson, but only that there was not an evidentiary basis supporting those facts.

Application of the doctrine of qualified immunity requires identifying the constitutional violation and the clearly established law with precision. The problem with the dissent's approach is that we would be completely replacing the district court's first pass with one of our own. The district court did not apply the multi-factored test, making the reverse engineering of the dissent inappropriate.

APPEAL DISMISSED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

*Jackson v. Besecker*, No. 16-1392,
**BACHARACH**, J., concurring in part in the judgment and dissenting in part.

A sheriff's deputy (Mr. Scott Jackson) wanted his boss's job and ran for Sheriff of Gunnison County against the incumbent (Sheriff Richard Besecker). Sheriff Besecker won and fired Mr. Jackson roughly four months after the election. Mr. Jackson viewed the firing as retaliation for his campaign against Sheriff Besecker. As a result, Mr. Jackson sued Sheriff Besecker under 42 U.S.C. § 1983, claiming violation of the First Amendment.[1]

Sheriff Besecker moved for summary judgment, asserting qualified immunity. In a skeletal order, the district court denied this motion, concluding that a fact-finder could reasonably find facts supporting a violation of a clearly established constitutional right.

Sheriff Besecker appealed, arguing that the district court had erred in

- denying his motion for summary judgment based on qualified immunity and

- failing to adequately identify the facts that a reasonable fact-finder could find.

Sheriff Besecker contends that based on the district court's failure to adequately identify the facts that could be found, we can review the record

---

[1]     Mr. Jackson also brought other claims against Sheriff Besecker. On appeal, Sheriff Besecker urges us to review the rulings on three of those claims. But as discussed below, we should decline to exercise pendent appellate jurisdiction over these rulings. *See* Part I(B), below.

de novo and arrive at our own conclusions about what a fact-finder could justifiably find.

I agree with Sheriff Besecker that the district court failed to adequately identify the facts that a reasonable fact-finder could find. In light of this failure, a de novo review of the record is appropriate.

Upon conducting a de novo review, I would affirm the ruling on the personal-capacity claim under § 1983, concluding that a fact-finder could justifiably find facts supporting a violation of clearly established law. The dispositive issue is whether a reasonable fact-finder could find that Mr. Jackson did not significantly disrupt the Sheriff's Office. In my view, this finding would be reasonable under the summary-judgment evidence.

The majority takes a different approach, dismissing the appeal for lack of jurisdiction. According to the majority, disputed material facts prevent our resolution of this appeal under the applicable legal test. I respectfully disagree with this approach, which I view as a deviation from our precedent.

## I.    Appellate Jurisdiction

In my view, we have jurisdiction over the ruling on qualified immunity. But we should not exercise jurisdiction over the rulings involving Sheriff Besecker's official capacity and state law.

## A. We have jurisdiction over the ruling on qualified immunity.

We have jurisdiction over the ruling on qualified immunity. This jurisdiction exists under 28 U.S.C. § 1291, which creates appellate jurisdiction over "final decisions" of district courts. 28 U.S.C. § 1291.

Typically, the denial of summary judgment does not constitute a final decision for purposes of § 1291. *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013). But under the collateral-order doctrine, we can immediately review the denial of qualified immunity. *See Weise v. Casper*, 507 F.3d 1260, 1263 (10th Cir. 2007). Thus, we may review whether the district court properly rejected Sheriff Besecker's summary-judgment argument on qualified immunity.

Ordinarily, in reviewing the denial of a summary-judgment motion based on qualified immunity, we cannot reconsider a district court's assessment of the facts that a reasonable fact-finder could find. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). Rather, we accept the court's assessment even if we might have assessed the evidence differently. *Id.* We then examine whether the facts identified by the district court would show the violation of a clearly established constitutional right. *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1267 (10th Cir. 2013).

In some circumstances, however, we may not be able to rely on the district court's assessment of the facts that a reasonable fact-finder could find. For instance, we cannot rely on this assessment when the district

3

court fails to "'set forth with specificity the facts . . . that support a finding that the defendant violated a clearly established right.'" *Lewis*, 604 F.3d at 1227 (ellipsis in original) (quoting *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1259 (10th Cir. 1998)); *see id.* at 1226-27 ("The problem with [the district court's] discussion is that it doesn't tell us what [the defendant] did or where, when, or why he took any action that might have violated [the plaintiff's] Fourth Amendment rights."). Faced with this type of failure, we "'review the entire record . . . and determine de novo whether the plaintiff in fact presented sufficient evidence to forestall summary judgment on the issue of qualified immunity.'" *Id.* at 1223 (ellipsis in original) (quoting *Armijo*, 159 F.3d at 1259).

Here the district court failed to adequately identify the facts that a reasonable fact-finder could find. The entirety of the court's discussion on these facts consisted of two sentences:

> Viewing the record in the light most favorable to Jackson, Sheriff Besecker considered Jackson's performance commendable until Jackson ran what Besecker considered a dirty campaign against him for Sheriff. After Besecker won, Besecker colluded with County officials and set about papering a trail that would justify Jackson's termination as a matter of Sheriff's Department policy.

Appellant's App'x at 612. This discussion did not address whether Mr. Jackson had caused significant disruption at the Sheriff's Office. In light of this omission, we have jurisdiction to conduct a de novo review of the

4

record and determine for ourselves what a reasonable fact-finder could find. *Lewis*, 604 F.3d at 1225.

Mr. Jackson contests our jurisdiction to conduct a de novo review of the record, pointing to an order entered during the pendency of the appeal. In this order, the district court ruled on two motions: (1) Mr. Jackson's motion to certify the appeal as frivolous and (2) Sheriff Besecker's motion to stay proceedings during the appeal. In Mr. Jackson's view, this order sheds light on the facts that the district court relied upon in denying summary judgment.

The parties appear to disagree over whether the district court's initial failure to identify facts is curable. For the sake of argument, I assume that this type of error is cured when a subsequent order adequately identifies the facts that a reasonable fact-finder could find. Even with that assumption, we would still have jurisdiction to conduct a de novo review of the record.

The subsequent order discusses the record more extensively than the order denying summary judgment based on qualified immunity does. But the subsequent order again fails to "'set forth with specificity the facts . . . that support a finding that the defendant violated a clearly established right.'" *Lewis v. Tripp*, 604 F.3d 1221, 1227 (10th Cir. 2010) (ellipsis in original) (quoting *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1259 (10th Cir. 1998)). For example, the subsequent order does not

5

identify any facts bearing on whether Mr. Jackson disrupted the functioning of the Sheriff's Office.

The subsequent order states: "Mr. Jackson claims . . . bad blood . . . [from the campaign for sheriff] spilled over into the day-to-day operations of the Sheriff's Department." Appellant's App'x at 666. But this statement is immaterial for two reasons. First, the district court never indicated whether a fact-finder could reasonably accept this factual assertion. Second, the district court is simply mistaken: Mr. Jackson has never claimed that bad blood from the campaign spilled over into the office's day-to-day operations. Indeed, Mr. Jackson alleges the opposite: that whatever happened in the campaign did *not* spill over into the office's day-to-day operations.

In addition, the subsequent order states:

> Besecker's assertion that the *Picerking/Connick* [sic] analysis required that I explicitly weigh his interest in carrying on an efficient and effective workplace against Jackson's protected First Amendment rights before denying his qualified immunity defense is not well taken where, as here, *the record is devoid of facts necessary to strike that balance in Besecker's favor*.

*Id.* at 668 (emphasis added). This general statement again omits any facts that could be found. The *Garcetti/Pickering* test addresses whether an employee's free-speech interest outweighs the government's interest in an efficient workplace. *See* Part II(B), below. In some circumstances, this test requires the court to examine whether the employee was disrupting the

6

workplace. *See id.* But the court failed to explain this legal framework or how it applies. Thus, the court's general statement is again deficient.

For these reasons, the subsequent order fails to adequately identify the facts that a fact-finder could justifiably find. Thus, the subsequent order does not preclude us from conducting a de novo review of the record.

The majority takes a different view, reasoning that disputed material facts preclude us from exercising jurisdiction. But as our precedents indicate, "'[w]e need not . . . decline review of a pretrial order denying summary judgment [in the qualified-immunity context] solely because the district court says genuine issues of material fact remain.'" *Henderson v. Glanz*, 813 F.3d 938, 948 (10th Cir. 2015) (second alteration and ellipsis in original) (quoting *Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001)). Instead, when the district court says that a material fact-issue exists, we may consider the legal question of whether the defendant's alleged conduct would violate a clearly established law. *Henderson*, 813 F.3d at 948. The presence of that legal question triggers appellate jurisdiction.

**B.** **We should not exercise pendent appellate jurisdiction over the official-capacity and state-law claims.**

The district court also denied summary judgment to Sheriff Besecker on an official-capacity claim and two claims under state law.[2] Sheriff Besecker appeals these rulings. We should decline to exercise jurisdiction over the rulings on these three claims.[3]

We could review the rulings on these claims only by exercising pendent appellate jurisdiction. Pendent appellate jurisdiction allows us to "'exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision that overlaps with an appealable decision.'" *Cox v. Glanz*, 800 F.3d 1231, 1255 (10th Cir. 2015) (quoting *Moore v. City of Wynnewood*, 57 F.3d 924, 929 (10th Cir. 1995)). Pendent appellate jurisdiction may be appropriate in two circumstances: (1) when an otherwise unappealable ruling is inextricably intertwined with a ruling that is appealable and (2) when review of the otherwise unappealable ruling is

---

[2] The first state-law claim is brought under Colo. Rev. Stat. § 24-34-402.5. Under this statute, it is generally "a discriminatory or unfair employment practice for an employer to terminate the employment of any employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours." Colo. Rev. Stat. § 24-34-402.5(1). The second state-law claim is brought under Colo. Rev. Stat. § 30-10-506, which provides: "Before revoking an appointment of a deputy, the sheriff shall notify the deputy of the reason for the proposed revocation and shall give the deputy an opportunity to be heard by the sheriff."

[3] The majority implicitly concludes that we lack jurisdiction over the rulings on these claims. I agree with this conclusion.

necessary to ensure meaningful review of the ruling that is appealable. *Cox*, 800 F.3d at 1256.

In his opening brief, Sheriff Besecker appeared to assert that Mr. Jackson's official-capacity claim "is intertwined with a determination of Sheriff Besecker's qualified immunity." Appellant's Opening Br. at 4-5. In his reply brief, he elaborates: "If this Court finds that Sheriff Besecker committed no constitutional violation and was wrongfully denied qualified immunity, this also requires dismissal of the official capacity claims against him." Appellant's Reply Br. at 17. For the sake of argument, I assume that Sheriff Besecker is correct—that if Sheriff Besecker committed no constitutional violation, dismissal of the official-capacity claim would be required. Even with that assumption, it would not be appropriate to exercise pendent appellate jurisdiction over the official-capacity claim, for a fact-finder could reasonably find facts supporting a constitutional violation. *See* Part II(B), below.

Sheriff Besecker has not argued that review of the official-capacity claim is necessary to ensure meaningful review of the personal-capacity claim. But if he had, I would reject that argument, for review of the official-capacity claim is not necessary for meaningful review of the personal-capacity claim. I would therefore dismiss this aspect of Sheriff Besecker's appeal for lack of jurisdiction.

9

Sheriff Besecker also has not argued that we should exercise pendent appellate jurisdiction over the rulings on the two state-law claims. He urges us to review those claims, but does not mention pendent appellate jurisdiction or contend that those claims are intertwined with the personal-capacity claim.

But even if Sheriff Besecker had asked us to exercise pendent appellate jurisdiction over these claims, I would deny that request because (1) these claims are not inextricably intertwined with the personal-capacity claim and (2) review of the state-law claims is not necessary to ensure meaningful review of Mr. Jackson's personal-capacity claim under § 1983. Thus, we lack any basis to exercise pendent appellate jurisdiction over the state-law claims. For this reason, I agree with the majority's decision to dismiss the appeal on the state-law claims. *See Cox v. Glanz*, 800 F.3d 1231, 1257 (10th Cir. 2015).

* * *

In light of the collateral-order doctrine and the district court's failure to adequately identify the facts that a reasonable fact-finder could find, we have jurisdiction to

- conduct a de novo review of the record for the personal-capacity claim, deciding for ourselves the facts that a fact-finder could reasonably find and

- analyze whether those facts would violate a clearly established constitutional right.

10

But it would not be appropriate to exercise pendent appellate jurisdiction over the official-capacity claim or the two state-law claims.

## II. Qualified Immunity

On the personal-capacity claim under § 1983, I would affirm the denial of summary judgment.

### A. The Standard of Review and the Burden Associated with Qualified Immunity

The district court concluded that Sheriff Besecker was not entitled to summary judgment based on qualified immunity. We would review this conclusion de novo. *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014). In applying de novo review, we would consider the evidence in the light most favorable to Mr. Jackson, resolving all factual disputes and drawing all reasonable inferences in his favor. *Id.*

I apply not only this standard of review but also the substantive burden of qualified immunity. That burden falls on Mr. Jackson, who must demonstrate that

- a reasonable fact-finder could find facts supporting the violation of a constitutional right[4] and

- the underlying right was clearly established.

*Id.* If this threshold burden is met, Sheriff Besecker must show that

---

[4] Alternatively, Mr. Jackson could demonstrate that a reasonable fact-finder could find facts supporting the violation of a statutory right. *See Deutsch v. Jordan*, 618 F.3d 1093, 1099 (10th Cir. 2010). But Mr. Jackson does not present an argument involving statutory rights.

11

- there are no genuine issues of material fact and

- he is entitled to judgment as a matter of law.

*Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).

### B. The fact-finder could reasonably find facts supporting a violation of the First Amendment.

The fact-finder could justifiably find facts supporting a First Amendment violation.

In assessing whether a public employer violated an employee's First Amendment right to free speech, courts apply the *Garcetti/Pickering* test. *See Morris v. City of Colorado Springs*, 666 F.3d 654, 661 (10th Cir. 2012). Under this test, courts consider "'whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests.'" *Id.* (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)). Sheriff Besecker argues that the government's interest in efficient public service outweighs Mr. Jackson's interest in free speech.[5] I would reject this argument because

---

[5] This test also involves four other prongs:

1. whether the speech was made pursuant to an employee's official duties,

2. whether the speech was on a matter of public concern,

12

- Sheriff Besecker must prove actual disruption and

- the fact-finder could reasonably infer that no disruption had taken place during or after the election.

## 1. Because the firing took place four months after the election, actual disruption is required.

Sheriff Besecker's argument requires proof of actual disruption, rather than the mere potential for disruption, because the firing took place four months after the election.

If the firing had taken place during the campaign, the sheriff might have been able to rely on the mere potential for disruption. We addressed a similar situation in *Jantzen v. Hawkins*, where a sheriff fired a deputy immediately after he had announced that he was going to run against the current sheriff. 188 F.3d 1247, 1256-58 (10th Cir. 1999). The sheriff justified the firing based on a prediction of disruption to the Sheriff's Office. *Id.* at 1257-58. The deputy challenged this justification, suing the sheriff under § 1983 for violating the First Amendment. *Id.* at 1250-51. We held that the deputy had failed to satisfy his burden under the

---

3. whether the speech constituted a motivating factor in the firing, and

4. whether the defendant would have fired the plaintiff in the absence of the speech.

*Leverington v. City of Colorado Springs*, 643 F.3d 719, 724 (10th Cir. 2011). But Sheriff Besecker does not dispute satisfaction of these other prongs.

13

*Garcetti*/*Pickering* test. *Id.* at 1256-58.[6] For this holding, we deferred to the sheriff's reasonable prediction of disruption. *See id.* at 1257-58.

We have approached the issue differently when the incumbent waited until after the election to fire the unsuccessful opponent. For example, we addressed this issue in *Kent v. Martin*, which involved a primary election. 252 F.3d 1141, 1142-44 (10th Cir. 2001). There the plaintiff was an employee of a county clerk's office who was fired six months after an unsuccessful campaign to unseat the county clerk. *Id.* at 1142. After the firing, the former employee sued, attributing the firing to a violation of the right to free speech. *See id.* at 1143. The district court granted summary judgment to the defendants, relying on what the court deemed to be the defendants' reasonable predictions of disruption. *Id.* at 1144.

We reversed, concluding that the defendants could not rely on a prediction of disruption when firing a subordinate six months after the election. *Id.* at 1144-46. We reasoned that "[i]f there has been no actual disruption justifying termination during the six months following an employee's protected speech, it is nonsensical to rely ex post facto on a

---

[6]     At that time, we called the test the "*Pickering*/*Connick*" test. *Id.* at 1256. That test did not consider whether the speech was made pursuant to an employee's official duties. *See id.* at 1257. That prong arose later based on the Supreme Court's opinion in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

14

'prediction' of disruption to tip the balance in favor of an employer's interest in an efficient workplace." *Id.* at 1146.

*Kent* applies because Mr. Jackson was fired over four months after the election. If Mr. Jackson had been significantly disrupting the Sheriff's Office since the start of his campaign, the government's efficiency interest would outweigh his free-speech interest. But if Mr. Jackson had not significantly disrupted the Sheriff's Office, the government's interest in efficiency would not have outweighed Mr. Jackson's interest in free speech.[7]

In analyzing whether we have jurisdiction, the majority states that "[t]here are genuine issues of material fact regarding any *potential* or actual disruption at the Sheriff's Office." Maj. O&J at 2 (emphasis added). But in my view, potential disruption would be irrelevant when the firing occurred over four months after an election.[8]

---

[7] At oral argument, Sheriff Besecker seemed to argue that if actual disruption occurred during the campaign, he could fire Mr. Jackson over four months after the election. *See* Oral Arg. at 10:25-11:41. For the sake of argument, I assume that Sheriff Besecker is correct. Even with that assumption, Sheriff Besecker would not be entitled to qualified immunity, for a fact-finder could justifiably conclude that no disruption had occurred during the campaign. *See* Part II(B)(2), (4) below.

[8] At oral argument, Sheriff Besecker appeared to agree, stating: "I would agree . . . that under the facts in our case, they would be more akin to . . . *Kent v. Martin* where actual disruption would be required." Oral Arg. at 7:03-7:12. This statement appeared to deviate from Sheriff Besecker's position in his reply brief. There Sheriff Besecker had argued

15

### 2. The fact-finder could reasonably conclude that no disruption had occurred during the campaign.

A fact-finder could reasonably find that Mr. Jackson had not disrupted the Sheriff's Office. *See* Part II(B)(2)-(4). With this finding, Mr. Jackson's interest in free speech would have outweighed the government's interest in efficient operation.

Sheriff Besecker argues that disruption occurred during the campaign, and that argument is supported by seven groups of evidence. But for each group of evidence supporting Sheriff Besecker's argument, contrary evidence exists. Viewing the conflicting evidence in the light most favorable to Mr. Jackson, the fact-finder could reasonably find that the Sheriff's Office had not experienced disruption during the campaign.

The first group of evidence consists of general statements that disruption was occurring as a result of Mr. Jackson's campaign. *See, e.g.*, Appellant's App'x at 377 (Sheriff Besecker stating: "The atmosphere, the enthusiasm, the concentration on duty, everything was different."). But according to some deputies, no disruption occurred. For instance, Undersheriff Randy Barnes testified that there had been no instance of disruption, "as opposed to people sort of feeling uncomfortable." *See id.* at 453. Similarly, a former deputy stated under oath that Mr. Jackson's

that he could rely on a reasonable prediction of disruption because *Kent* was distinguishable.

16

campaign had not disrupted the Sheriff's Office or negatively affected operations.

The second group of evidence concerns meetings between patrol supervisors and jail supervisors. Prior to the campaign, Mr. Jackson attended these meetings as a patrol lieutenant. But some evidence suggests that during the campaign, the joint meetings stopped and the patrol supervisors and the jail supervisors began to meet separately. Sheriff Besecker attributes this change to some supervisors' discomfort in voicing opinions out of fear that Mr. Jackson's campaign might use these comments as campaign fodder.

Other evidence paints a different picture. This evidence indicates that

- the joint meetings continued throughout the campaign and

- the joint meetings were not important, mandatory, or consistently held.

The third category of evidence involves Mr. Jackson's behavior at the joint meetings when they were held. Undersheriff Barnes testified that during the campaign, Mr. Jackson had begun to act boldly at the joint meetings: "After he threw his name in the hat for the sheriff's position he became very bold in saying that: I would not like to do that. I wouldn't like to do that." *Id.* at 433. In Undersheriff Barnes' view, these bold statements negatively affected the meetings.

17

But Undersheriff Barnes's testimony was disputed by Mr. Jackson, who testified that his behavior had not changed during the campaign. *Id.* at 344 (Mr. Jackson testifying that his "behavior at those meetings did not change" after announcing his candidacy).

The fourth group of evidence concerns training sessions that Mr. Jackson attended during the campaign. According to reports allegedly received by Undersheriff Barnes, Mr. Jackson's presence at these training sessions made people uncomfortable. But as Undersheriff Barnes recognized, merely making people feel uncomfortable is not tantamount to disruption. In addition, the instructor at these training sessions testified that he did not remember anything unusual about the training sessions when Mr. Jackson was present. Thus, the fact-finder could justifiably infer that Mr. Jackson's presence at these training sessions was not disruptive.

The fifth group of evidence relates to a performance evaluation that was never completed. In 2014, Mr. Jackson filled out a portion of his evaluation for 2013, marking himself as exceeding standards in every category. Undersheriff Barnes was supposed to complete the evaluation. According to Undersheriff Barnes, he would have had to give Mr. Jackson a lower mark in at least some categories. But Sheriff Besecker allegedly instructed Undersheriff Barnes not to complete the evaluation, fearing that the completed evaluation would be viewed as retaliatory or become an issue in the campaign.

18

But again, contrary evidence exists. For example, some evidence indicated that Undersheriff Barnes had failed to complete Mr. Jackson's 2012 evaluation. That evidence suggests that the failure to complete Mr. Jackson's 2013 evaluation had nothing to do with the campaign.

The sixth group of evidence concerns Sheriff Besecker's alleged direction to Undersheriff Barnes not to address any of Mr. Jackson's performance or disciplinary issues. According to Sheriff Besecker, this instruction was necessary to avoid the appearance of retaliation and to avoid creating a campaign issue.

Later Mr. Jackson allegedly failed to adequately perform a duty he had been assigned: monitor and regulate the holiday, vacation, and comp time of the deputies. According to Undersheriff Barnes, he alerted Sheriff Besecker, who said not to address the issue.

But Mr. Jackson stated under oath that he had always performed this duty adequately. The fact-finder could reasonably credit this statement. And the fact-finder could justifiably question the reason for Sheriff Besecker's instruction. For example, the fact-finder could reasonably infer that Sheriff Besecker had given this instruction to Undersheriff Barnes to create an unresolved performance issue that could later be used as a reason to fire Mr. Jackson. This inference would be reasonable, for some other evidence suggests that Sheriff Besecker retaliated against Mr. Jackson by

19

firing him and then pretended that the firing was based on performance issues. *See* Part II(B)(4), below.

The seventh group of evidence concerns Sheriff Besecker's statements about his relationship with Mr. Jackson. According to this evidence, the relationship between Sheriff Besecker and Mr. Jackson degenerated once the campaign began. For instance, Sheriff Besecker stated under oath that his

> relationship with Jackson after he announced his candidacy was stifled. Jackson was my Lieutenant, my third in command, and I no longer felt that I could approach him or speak freely with him regarding what I needed him to do both as a law enforcement officer and as a leader within the Sheriff's Office.

Appellant's App'x at 219. Sheriff Besecker added that Mr. Jackson's misrepresentations of his own qualifications had resulted in distrust.

But the fact-finder could justifiably reject this testimony and rely instead on contrary evidence. For instance, Sheriff Besecker indicated in an interview that he had a healthy relationship with Mr. Jackson:

> Besecker acknowledged that he was not surprised by Jackson's announcement, but is dedicated to maintaining a solid working relationship with the officer.
>
> . . . .
>
> Besecker says he has almost daily communication with Jackson and by doing so, the department can be reassured of its stability.
>
> "It's not for show's sake, I know that Scott's sincere and I am sincere," Besecker said.

20

*Id.* at 573. In addition, Mr. Jackson denied misrepresenting his qualifications. Thus, the fact-finder could reasonably infer that Sheriff Besecker had not lost trust in Mr. Jackson.

In sum, for each group of evidence supporting Sheriff Besecker's version of the facts, contrary evidence supports Mr. Jackson's version. Thus, a genuine factual dispute exists on whether the Sheriff's Office was actually disrupted during the campaign. At this stage of the proceedings, this factual dispute must be resolved in Mr. Jackson's favor. *See* Part II(A), above.

### 3. The fact-finder could reasonably conclude that no disruption had occurred after the election.

Sheriff Besecker also alleges disruption after the election. For this allegation, Sheriff Besecker

- points to considerable evidence that arguably does not show actual disruption and

- ignores contrary evidence.

Viewing the evidence in the light most favorable to Mr. Jackson, the fact-finder could reasonably conclude that disruption had not occurred after the election.

Mr. Jackson discusses a private meeting that he allegedly had with Sheriff Besecker after the election. According to Mr. Jackson, he explained at the meeting that he had run only because he thought that he could do a better job, not out of animosity. Sheriff Besecker appears to view this

21

explanation as a challenge to his competence and authority, suggesting that this challenge was disruptive. But the fact-finder could justifiably take a different view of Mr. Jackson's explanation, seeing it as an attempt to ease tensions with Sheriff Besecker.

At another meeting after the election, Sheriff Besecker allegedly asked about Mr. Jackson's plans for the next couple of years. According to Mr. Jackson, he answered that he wanted to improve the department and to obtain greater authority "to tweak things" as a patrol supervisor. Appellant's App'x at 348. Sheriff Besecker treats Mr. Jackson's answer as a demand for greater authority. But a fact-finder could reasonably conclude that Mr. Jackson was merely stating that he wanted greater authority; the fact-finder would not be compelled to find actual disruption from Mr. Jackson's answer.

In an affidavit, Sheriff Besecker stated under oath that after the election, Mr. Jackson took "no steps to outwardly show regard and respect to me in front of the deputies and I felt this had a negative impact on the overall morale of the department." *Id.* at 222. But other evidence indicates that the Sheriff's Office was not disrupted in the aftermath of the election. For instance, Mr. Jackson stated under oath that he had not seen a "change in the enthusiasm or concentration of patrol deputies after the election. Officers continued to work and fulfill their duties as they previously had." *Id.* at 348.

22

In addition, the record indicates that following the election, the joint meetings with the patrol supervisors and jail supervisors resumed (if they had ever stopped in the first place). Describing a joint meeting after the election, Mr. Jackson stated that the "meeting was held without incident" and that "[t]he meeting appeared to me to be no different than any of the other meetings I attended with or without someone representing the detention unit present." *Id.* at 345. Absent actual disruption, Mr. Jackson's alleged failure to outwardly show respect for Sheriff Besecker would be irrelevant.

Sheriff Besecker also stated that after the election, "it was clear that Jackson did not trust my judgment." *Id.* at 222. And during one post-election meeting between Sheriff Besecker and Mr. Jackson, Sheriff Besecker allegedly opined that the two individuals distrusted each other's judgment. In Sheriff Besecker's view, this lack of trust was disruptive.

Sheriff Besecker adds that "conversations between Plaintiff and Sheriff Besecker after the election conclusively show that their relationship was no longer built on any loyalty or confidence." Appellant's Reply Br. at 9. In his view, "the very fact that Plaintiff's 'personal loyalty' to Sheriff Besecker had deteriorated was enough to justify his termination." Appellant's Opening Br. at 37. But the fact-finder could justifiably infer that (1) Mr. Jackson had trusted Sheriff Besecker's judgment and remained a loyal employee and (2) Sheriff Besecker had

23

fired Mr. Jackson based on retaliation rather than disruption of the Sheriff's Office. *See* Part II(B)(4), below (discussing evidence suggesting that Sheriff Besecker retaliated against Mr. Jackson by firing him).

In sum, a genuine factual dispute exists on whether the Sheriff's Office experienced disruption after the election. Some evidence supports Sheriff Besecker's version of the facts; other evidence supports Mr. Jackson's version. Ultimately, the fact-finder may side with Sheriff Besecker. But at this stage of the proceedings, the factual dispute must be resolved in Mr. Jackson's favor. *See* Part II(A), above.

## 4. Evidence also suggested that the firing was retaliatory.

Viewing the evidence favorably to Mr. Jackson, I believe that the fact-finder could reasonably (1) attribute the firing to retaliation for the campaign and (2) find use of performance issues as a pretext.

Sheriff Besecker kept a diary and made multiple entries expressing displeasure with Mr. Jackson's campaign. One entry described a post-election meeting between Sheriff Besecker and Mr. Jackson. Sheriff Besecker wrote that at the meeting, he found Mr. Jackson's "attitude poor and his demeanor arrogant. It seemed that he felt that he was entitled to go on with his career without a hiccup." Appellant's App'x at 122. At his deposition, Sheriff Besecker indicated that he had anticipated that Mr. Jackson would do something "between pleading for his job and groveling." *See* Dist. Dkt. Doc. 42-2, at 37-39.

24

The summary-judgment record also contains an email from a county attorney to Sheriff Besecker:

> Linda provided me with the attached time sheets in response to our discussion regarding erroneous time sheets provided by Scott Jackson. Unfortunately, I think the timesheets are going to be less compelling than we intended, as they appear to be signed by Randy Barnes and not Scott Jackson. While we could still make the argument that Scott submitted the erroneous sheets, it does create an argument that Randy bore the responsibility for the sheets since he signed off.
>
> That said, it does not change all that we discussed on Friday or our intended course of action.

Appellee's Supp. App'x at 1. From this email, a fact-finder could reasonably infer that Sheriff Besecker was searching for a performance issue that he could use to justify the firing.

This inference is supported by another document, which purports to list a series of Mr. Jackson's performance issues. At his deposition, Sheriff Besecker admitted that he had worked on this document.

Sheriff Besecker ultimately fired Mr. Jackson through a letter. The letter did not elaborate on why Mr. Jackson was being fired. It simply stated: "Your continued employment as a Deputy Sheriff undermines the effective discharge of my duties as Gunnison County Sheriff, negatively impacts morale of the employees of the Sheriff's Office, and overall impedes the efficient performance of this Office's obligations." Dist. Dkt. Doc. 36-2, at 13. Sheriff Besecker subsequently met with Mr. Jackson, but refused to provide any further explanation for the firing.

25

After the firing, Mr. Jackson filed charges with the Equal Employment Opportunity Commission for age discrimination and retaliation. In connection with these charges, Sheriff Besecker told the EEOC that he had fired Mr. Jackson because of performance issues. And early in this litigation, Sheriff Besecker represented in district court that he had fired Mr. Jackson based partly on deficiencies in his performance. For example, Sheriff Besecker stated in one district court filing that personnel from other law enforcement agencies and an emergency dispatch agency had complained about Mr. Jackson. According to this filing, the complaints contributed to Mr. Jackson's firing. But according to a private investigator, all of the alleged complainants later denied that they had complained about Mr. Jackson.

Sheriff Besecker ultimately abandoned the argument that Mr. Jackson had been fired because of performance issues, with Sheriff Besecker confirming that Mr. Jackson's employment had not been "revoked because of any performance issues." Appellant's App'x at 398.

In light of this evidence, a fact-finder could reasonably infer that (1) Sheriff Besecker had concocted a false explanation, attributing the firing to performance issues as a pretext for retaliation and (2) the current explanation, based on disruption of the Sheriff's Office, is also pretextual. Of course, the fact-finder could instead conclude that Mr. Jackson had disrupted the Sheriff's Office. But at this stage of the proceedings, we

26

must draw all reasonable inferences in Mr. Jackson's favor. *See* Part II(A), above.

* * *

Sheriff Besecker denies violating Mr. Jackson's right to free speech, arguing that the government's efficiency interest outweighed Mr. Jackson's free-speech interest because of the disruption to the Sheriff's Office. But viewing the evidence in the light most favorable to Mr. Jackson, the fact-finder could justifiably conclude that Mr. Jackson had not disrupted the Sheriff's Office. If the fact-finder had drawn this conclusion, Mr. Jackson's free-speech interest would have outweighed the government's efficiency interest. Thus, the fact-finder could reasonably find facts constituting a violation of the right to free speech.

## C. The underlying right was clearly established.

In my view, Mr. Jackson's right to free speech was clearly established.

A constitutional right is clearly established when a Tenth Circuit precedent is on-point, making the constitutional violation readily apparent. *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011). Here two Tenth Circuit precedents are on-point: (1) *Jantzen v. Hawkins*, 188 F.3d 1247 (10th Cir. 1999) and (2) *Kent v. Martin*, 252 F.3d 1141 (10th Cir. 2001).

27

In *Jantzen*, a deputy was fired who ran for sheriff. In assessing whether the deputy's right to free speech was violated, we applied the *Garcetti/Pickering* test. *See Jantzen*, 188 F.3d at 1256-58. And in *Kent*, we expressly stated that "[s]ix months after the employees' expression [of protected speech], a so-called 'prediction' of disruption would be meaningless to justify their termination, and under our case law evidence of actual disruption would be required to outweigh the employees' interest in their speech." 252 F.3d at 1144. Thus, under *Jantzen* and *Kent*, any reasonable sheriff would know that when a deputy who had run for sheriff is fired over four months after the election, actual disruption is required for the government's efficiency interest to outweigh the deputy's free-speech interest.

Taken together, these precedents placed the alleged constitutional violation beyond debate. *White v. Pauly*, 137 S. Ct. 548, 551 (2017). Thus, a fact-finder could reasonably find facts supporting the violation of a clearly established constitutional right.[9]

---

[9] In his reply brief, Sheriff Besecker suggests that we may consider only those cases that the district court considered. But because our review is de novo, we must consider the applicable cases regardless of whether they were considered by the district court. *See* Part II(A), above.

28

## III. Conclusion

In two orders, the district court failed to identify facts indicating the violation of a clearly established right. In light of this failure and the collateral-order doctrine, we have jurisdiction to

- review the summary-judgment record de novo and identify the facts that a fact-finder could reasonably find and

- determine whether those facts would show the violation of a clearly established constitutional right.

But it would not be appropriate to exercise pendent appellate jurisdiction over the official-capacity claim and the two state-law claims. These claims are not inextricably intertwined with the personal-capacity claim under § 1983, and review of these claims is not necessary to ensure meaningful review on the personal-capacity claim.

On the merits, the dispositive issue is whether a reasonable fact-finder could reject Sheriff Besecker's allegation of actual disruption. In my view, a fact-finder could reasonably reject this allegation. As a result, I would affirm the district court's denial of summary judgment based on qualified immunity.

Because the majority instead dismisses the entire appeal for lack of jurisdiction, I respectfully dissent from the majority's disposition on the personal-capacity claim under § 1983.

29